PEOPLE v PALMER

1. CRIMINAL LAW—BURDEN OF PROOF—REASONABLE DOUBT—APPEAL
   AND ERROR—JURY—EVIDENCE—QUESTIONS OF FACT—INFER-
   ENCES.

   The burden is on the prosecution in a criminal trial to prove the
   defendant's guilt beyond a reasonable doubt on every element
   of the crime charged; on appeal from a conviction a defendant
   may request the appellate court to determine if the prosecution
   fulfilled this burden and in conducting this review the appellate
   court must remember that the jury is the sole judge of the
   facts; it is the function of the jury alone to listen to testimony,
   weigh the evidence and decide the questions of fact, and in
   determining the facts the jury may draw reasonable inferences
   from the facts established by either direct or circumstantial
   evidence.

2. CRIMINAL LAW—JURY—WITNESSES—CREDIBILITY—EVIDENCE—REA-
   SONABLE DOUBT—APPEAL AND ERROR.

   Juries, not appellate courts, see and hear witnesses and are in a
   much better position to decide the weight and credibility to be
   given to their testimony; where sufficient evidence exists, which
   may be believed by the jury, to sustain a verdict of guilty
   beyond a reasonable doubt, the decision of the jury should not
   be disturbed by an appellate court.

3. CRIMINAL LAW—EVIDENCE—REASONABLE DOUBT—APPEAL AND ER-
   ROR.

   The reviewing court, in a criminal case, must examine the record
   to determine whether the evidence was ample to warrant a

REFERENCES FOR POINTS IN HEADNOTES
[1, 3] 30 Am Jur 2d, Evidence §§ 1170–1172.
   Rule of reasonable doubt as applicable to reasonable doubt on part
   of individual juror, 137 ALR 394.
[2] 58 Am Jur, Witnesses § 860 *et seq.*
[4] 21 Am Jur 2d, Criminal Law §§ 10–13.
[5] 21 Am Jur 2d, Criminal Law §§ 120–123, 127, 129.
[6] 21 Am Jur, Criminal Law § 119.
[7] 40 Am Jur 2d, Homicide §§ 541–543.

jury verdict of guilty beyond a reasonable doubt of the crime charged.

4. HOMICIDE—MANSLAUGHTER—STATUTES—COMMON LAW.

The statutory provision on manslaughter in Michigan prescribes only the penalty for the crime leaving the definition to be found at common law (MCLA 750.321).

5. CRIMINAL LAW—AIDING AND ABETTING—PRINCIPAL—ACCESSORY—STATUTES—COMMON LAW—CONVICTION OF PRINCIPAL.

The purpose of the aiding and abetting statute was to abolish the common-law distinction between accessories before the fact and principals so that one who counsels, aids or abets in the commission of an offense may be tried and convicted as if he had directly committed the offense; additionally, the statute changed the common-law requirement that the principal must be convicted before the prosecution of the accessory (MCLA 767.39).

6. CRIMINAL LAW—WORDS AND PHRASES—AIDING AND ABETTING—PRINCIPAL—ACCESSORY.

The phrase "aiding and abetting" in criminal law is used to describe all forms of assistance rendered to the perpetrator of a crime; the term comprehends all words or deeds which may support, encourage or incite the commission of a crime; it includes the actual or constructive presence of an accessory, in preconcert with the principal, for the purpose of rendering assistance, if necessary, and the amount of advice, aid or encouragement is not material if it had the effect of inducing the commission of the crime.

7. HOMICIDE—MANSLAUGHTER—INVOLUNTARY MANSLAUGHTER—AIDING AND ABETTING—EVIDENCE—SUFFICIENCY—WITNESSES.

There was sufficient evidence to warrant a jury's verdict that defendant was guilty beyond a reasonable doubt of involuntary manslaughter under the aiding and abetting statute where at trial the prosecution presented the testimony of two witnesses to connect defendant with the sequence of events preceding the victim's death which, if believed by the jury, established that defendant arrived at the victim's house in the company of another and escorted the victim from his house towards a waiting automobile and that, as the victim's wife attempted to intervene, defendant, by hand gesture, warned her to remain inside her house while, at the same time, positioning himself to preclude any further interference, and he remained in this position until after the other person and the victim had entered

the car, at which time he rejoined the other person and departed with him; from these facts the jury could have concluded that defendant acted in silent unison with the other person, remained in position to render assistance, if necessary, and took positive action to prohibit interference with the other person's intentions (MCLA 750.321, 767.39).

Appeal from Court of Appeals, Division 2, Quinn, P. J., and R. B. Burns and Byrns, JJ., reversing Macomb, Alton H. Noe, J. Submitted June 5, 1974. (No. 14 June Term 1974, Docket No. 54,639.) Decided August 2, 1974.

John J. Palmer was convicted of involuntary manslaughter. Defendant appealed to the Court of Appeals. Reversed. The people appeal. Reversed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *George N. Parris,* Prosecuting Attorney, *Thaddeus F. Hamera,* Chief Appellate Lawyer, and *Don L. Milbourn,* Assistant Prosecuting Attorney, for the people.

*Fred A. York,* for defendant on appeal.

T. M. KAVANAGH, C. J. Defendant, John Joseph Palmer, has been twice tried and convicted of manslaughter. Defendant's first conviction was reversed by the Court of Appeals because of an error in the trial. *People v Palmer,* 28 Mich App 624; 185 NW2d 94 (1970). On retrial defendant was charged with manslaughter[1] under the aiding and abetting statute.[2] This trial also resulted in a jury verdict of guilty of involuntary manslaughter.

On appeal, the Court of Appeals, in an unpublished per curiam opinion, No. 12993 dated January 15, 1973, declared that none of defendant's

[1] MCLA 750.321; MSA 28.553.
[2] MCLA 767.39; MSA 28.979.

raised issues disclosed any basis for reversible error. However, the Court *sua sponte* raised the question of sufficiency of the evidence and reversed defendant's conviction on that issue.

This Court granted the prosecutor's application for leave to appeal from that decision.[3]

A review of the record discloses that on March 28, 1968, at approximately 7 p.m., two men, Robert Dunaway and defendant, rang the doorbell of Sam DiMaggio's house in Sterling Heights. Mr. Di-Maggio answered the door and both men entered the home. There was testimony that defendant remained near the front door while Dunaway escorted DiMaggio into the kitchen to get his jacket. After DiMaggio hurriedly said "good-by" to his wife, Dunaway and defendant ushered him from the house towards a waiting automobile. As the three men crossed the front yard DiMaggio's wife attempted to leave the house. Mrs. DiMaggio testified that as she started to open the front door defendant turned, took several steps in her direction and gestured with his hand for her to remain inside. In response to defendant's gesture she closed the storm door but remained in the doorway to observe what was happening.

Upon arriving at the car, first DiMaggio and then Dunaway entered the rear seat from the passenger side. Mrs. DiMaggio next observed Dunaway strike her husband twice with his fist. She said that both blows landed on the left side of his head. At this point she left the doorway to summon the police. As she departed she noticed the defendant was running towards the car but she did not see him enter the car, nor did she see the car drive away.

Kenneth Piatkoski, a boyfriend of Mrs. Di-

---

[3] *People v Palmer,* 390 Mich 752 (1973).

Maggio's oldest daughter, also testified[4] that Dunaway and the defendant arrived together and shortly afterwards escorted Sam DiMaggio from the house. He stated that the men left in a group with DiMaggio in the center and Dunaway and the defendant on either side. Although he was not in a position to observe the men as they crossed the front yard; he did go to the front door after they reached the car. He testified the defendant got into the front passenger seat and that as the car drove away he observed Dunaway strike DiMaggio at least twice on the right side of the head.

A few hours later that same evening, about 9:30 p.m., Mrs. DiMaggio heard a car stop and then drive away. Mr. Piatkoski went outside and found Sam DiMaggio lying in the middle of the street. DiMaggio had been severely beaten about the face and left side of his head. In a dying declaration heard by several witnesses, he said that five guys had beaten him and he specifically named Robert Dunaway as one of the attackers. DiMaggio was rushed to Saratoga Hospital in Detroit where he died the next day.

The medical testimony on the fatal injuries was uncontested. The medical examiner testified that DiMaggio had severe contusions on the left side of the face caused by a blunt instrument, which could have been a fist. The cause of death was described as a severe traumatic injury to the brain with subdural hemorrhage. This damage was found on the right side of the brain. The prosecution asked the following question to explain the connection between the internal and external injuries.

"*Q.* In your experience, Doctor, as a Forensic Patholo-

---

[4] As Mr. Piatkoski was not available at trial, his testimony from the 1968 preliminary examination was read to the jury.

gist, can you explain to this jury the reason for the presence of the massive hemorrhage on the right side of the brain and damage to the right side of the brain when in fact the external contusions were to the left side of the head?

"*A.* Well, we called this condition contra-coup *[sic]*. That means it is opposite to the side of the injury, and what happens is that as the head is struck the brain is sort of movable within the skull, which is, of course hard and solid, and when it is hit on one side it'll throw the brain to the opposite side hitting the hard surface of the skull on the opposite side causing the injuries and hemorrhages that I have described."

The doctor further testified the contrecoup injury occurs when the victim is struck in the head while the body is in an upright position with the head erect and movable.

The sole issue before this Court is whether the evidence is sufficient to warrant the jury's finding that defendant was guilty of aiding and abetting in the felonious slaying of Sam DiMaggio. The prosecution contends DiMaggio's death amounted to involuntary manslaughter and that defendant's involvement made him criminally responsible for this death.

In a criminal trial the burden is on the prosecution to prove the defendant's guilt beyond a reasonable doubt on every element of the crime charged. On appeal from a conviction a defendant may request the appellate court to determine if the prosecution fulfilled this burden. In conducting this review the appellate court must remember that the jury is the sole judge of the facts. It is the function of the jury alone to listen to testimony, weigh the evidence and decide the questions of fact. *People v Mosden,* 381 Mich 506, 510; 164 NW2d 26 (1969). In determining the facts the jury may draw reasonable inferences from the facts

established by either direct or circumstantial evidence. *People v Weyonen,* 247 Mich 308, 311; 225 NW 552 (1929).

Juries, not appellate courts, see and hear witnesses and are in a much better position to decide the weight and credibility to be given to their testimony. Where sufficient evidence exists, which may be believed by the jury, to sustain a verdict of guilty beyond a reasonable doubt, the decision of the jury should not be disturbed by an appellate court. *People v Moore,* 306 Mich 29, 33; 10 NW2d 296 (1943).

In a criminal case the reviewing court must examine the record to determine whether the evidence was ample to warrant a jury verdict of guilty beyond a reasonable doubt of the crime charged. *People v Williams,* 368 Mich 494, 501; 118 NW2d 391 (1962). In *People v Howard,* 50 Mich 239, 242–243; 15 NW 101 (1883), this Court considered the proper role of an appellate court reviewing the jury's decision.

"As to whether the evidence introduced was sufficient to sustain the charge made, we need but say that if there was evidence tending to sustain the charge made in either of the counts, then this Court will not attempt to weigh the same and say whether the jury ought or not to have considered it sufficient. In testing this case we are not required to take that which respondent relies upon and that which would tend against him, and from a comparison thereof determine which was the stronger and better, or, deducting the one from the other, say what, if anything, was left. This would be but a weighing of the evidence and was entirely within the province of the jury. Nor are we to take the evidence in the order, question and answer, in which it was given, but finding it where we may, and putting what was most favorable to the prosecution together, and discarding all other, can this Court say it fairly tended to establish the charge made? If so, then the verdict of the

jury in this Court must be considered as final. If, however, we find a total want of evidence upon any essential point, then it becomes a clear duty to sustain the exceptions taken."

To convict this defendant the prosecution had to establish beyond a reasonable doubt that the defendant's activity amounted to aiding and abetting a manslaughter. The instructions of the trial judge limited the jury to the possible verdicts of either guilty of involuntary manslaughter or not guilty. The jury weighed the evidence and concluded that the defendant had been proven guilty beyond a reasonable doubt of the crime of involuntary manslaughter.

In Michigan the statutory provision on manslaughter, MCLA 750.321; MSA 28.553, prescribes only the penalty for the crime leaving the definition to be found at common law. *People v Townes,* 391 Mich 578, 588; 218 NW2d 136 (1974). In *Townes,* we restated the common-law description of manslaughter approved by this Court in previous cases. It is clear from the facts of this case that Sam DiMaggio was a victim of at least involuntary manslaughter as defined in *People v Townes, supra.*

The medical evidence established that DiMaggio's death was a direct result of the violent assault inflicted on him. Two witnesses observed Robert Dunaway assault DiMaggio and the victim's dying declaration specifically named Dunaway as his attacker. There is no fact or circumstance indicating that DiMaggio's death was the result of other than criminal activity. From these facts the jury could have properly concluded that Dunaway was the perpetrator of the criminal assault which caused DiMaggio's death.

Defendant was charged under the aiding and

abetting statute, MCLA 767.39; MSA 28.979. The purpose of this statute was to abolish the common-law distinction between accessories before the fact and principals so that one who counsels, aids or abets in the commission of an offense may be tried and convicted as if he had directly committed the offense. *People v Gould,* 384 Mich 71, 77; 179 NW2d 617 (1970).

Additionally, the statute changed the common-law requirement that the principal must be convicted before the prosecution of the accessory. In *People v Smith,*[5] 271 Mich 553, 561; 260 NW 911 (1935) we said:

"The effect of our statute is to permit the prosecution of one who aids and abets, without regard to the conviction or acquittal of one who, under the common law, would have been called the principal. That is what the statute intended to accomplish in abrogating the common-law rule. One who aids and abets may be charged and convicted as a principal."

In criminal law the phrase "aiding and abetting" is used to describe all forms of assistance rendered to the perpetrator of a crime. This term comprehends all words or deeds which may support, encourage or incite the commission of a crime. It includes the actual or constructive presence of an accessory, in preconcert with the principal, for the purpose of rendering assistance, if necessary. 22 CJS, Criminal Law, § 88(2), p 261. The amount of advice, aid or encouragement is not material if it had the effect of inducing the commission of the crime. *People v Washburn,* 285 Mich 119, 126; 280 NW 132 (1938).

At trial the prosecution presented the testimony

---

[5] The present statute MCLA 767.39; MSA 28.979 is a reenactment of 1929 CL 17253.

of two witnesses to connect defendant with the sequence of events which preceded Sam DiMaggio's death. If believed by the jury, these witnesses established that defendant arrived at DiMaggio's house in the company of Robert Dunaway. Defendant accompanied Dunaway into the house and shortly afterwards both men escorted DiMaggio from his house towards a waiting automobile. As Mrs. DiMaggio attempted to intervene, defendant, by hand gesture, warned her to remain inside her house while, at the same time, positioning himself to preclude any further interference. He remained in this position until after Dunaway and DiMaggio had entered the car, at which time he rejoined Dunaway and departed with him. From these facts the jury could have concluded that defendant acted in silent unison with Dunaway, remained in position to render assistance, if necessary, and took positive action to prohibit interference with Dunaway's intentions.

Our examination of the record establishes that there was sufficient evidence to warrant the jury's verdict that defendant was guilty beyond a reasonable doubt.

The decision of the Court of Appeals is reversed and the judgment of the trial court is hereby affirmed.

T. G. KAVANAGH, SWAINSON, WILLIAMS, M. S. COLEMAN, and J. W. FITZGERALD, JJ., concurred with T. M. KAVANAGH, C. J.

LEVIN, J., did not sit in this case.