## PEOPLE v ZINN

1. Jury—Evidence—Question of Fact—Inferences.

   It is the function of the jury alone to listen to testimony, weigh the evidence and decide the questions of fact, and in determining the facts the jury may draw reasonable inferences established by either direct or circumstantial evidence.

2. Sodomy—Time—Lack of Specificity—Preserving Question—Cure—Time of Essence—Miscarriage of Justice.

   Lack of specificity in the information, the proofs, and the instructions to the jury as to the time that an act of sodomy was alleged to have occurred will not result in reversal where, had the objection been timely made at trial, the trial judge could have cured and overcome any error by an instruction to the jury, time was not of the essence of the crime charged, and no miscarriage of justice could result from refusal to heed the objection.

3. Criminal Law—Preliminary Examinations—Transcripts—Failure to File—Circuit Courts—Jurisdiction—Waiver—Prejudice.

   Statutes provide for the transcription and filing in the circuit court of testimony taken at a preliminary examination, and the circuit court does not acquire jurisdiction of a case until the proper return is filed by the examining magistrate, but failure to file a transcript of a preliminary examination does not make the return improper in a jurisdictional sense; the right to a transcript can be waived by failure to object to its absence, and an untimely filing is reversible error only where there is a showing of prejudice (MCLA 766.11, MCLA 767.40).

4. Criminal Law—Preliminary Examinations—Transcripts—Failure to File—Prejudice.

   There was no prejudice by reason of the fact that a transcript of a preliminary examination was not filed prior to trial where

---

References for Points in Headnotes
[1] 47 Am Jur 2d, Jury § 14.
[2, 5] 70 Am Jur 2d, Sodomy § 17 *et seq.*
[3, 4] 21 Am Jur 2d, Criminal Law § 313.

defense counsel knew that the examination had been held, failed to object to the lack of transcript until after the first witness had testified, and then did so only because it was his erroneous belief that the sole witness at the preliminary examination was not going to testify at trial, and where after hearing a disc recording of the examination defense counsel failed to object to its claimed incomprehensibility until after the jury had begun deliberations; defense counsel did not need the transcript to prepare for trial.

5. WITNESSES—CRIMINAL LAW—SODOMY—INTIMIDATION—DUTY TO TESTIFY—PERJURY—WARNING—PROSECUTORS—PRESERVING QUESTION.

Witnesses for the prosecution in a sodomy trial who had suddenly fallen under the mistaken belief that they were not bound to testify and so informed the prosecutor were not unduly threatened or intimidated when reminded by the prosecutor of the penalties for perjury, where on cross-examination the witnesses maintained they were not intimidated and where defense counsel did not move for mistrial based on the alleged intimidation but chose instead to make credibility an issue.

Appeal from Muskegon, Charles A. Larnard, J. Submitted June 2, 1975, at Grand Rapids. (Docket No. 20145.) Decided August 12, 1975.

Wilbur Zinn was convicted of sodomy. Defendant appeals. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *Richard A. Pasarela,* Prosecuting Attorney (Prosecuting Attorneys Appellate Service, *Edward R. Wilson,* Director, by *Lee W. Atkinson),* for the people.

*Fredric F. Balgooyen,* for defendant on appeal.

Before: McGREGOR, P. J., and D. E. HOLBROOK and N. J. KAUFMAN, JJ.

D. E. HOLBROOK, J. Defendant was charged with the crime of sodomy, MCLA 750.158; MSA 28.355,

and with assault with intent to commit sodomy, MCLA 750.85; MSA 28.280, as the result of acts which occurred from October 30, 1973 through November 5, 1973 in the Muskegon County Jail. The victim of the assaults was an 18-year-old fellow inmate of the defendant. Originally, defendant was charged with a third fellow inmate, but the third inmate was granted immunity from prosecution in return for testimony against defendant. Defendant was tried before a jury on January 24, 1974, and was convicted of the crime of sodomy. He was sentenced to from 10 to 15 years in prison. He appeals as of right.

Defendant's first allegation of error is that there was insufficient proof of sodomy offered at trial to support his conviction. This first allegation of error borders on the frivolous, but its answer will serve to further elucidate the facts of the case.

Defendant essentially bases his first argument on what he believes to be a lack of proof of "sexual penetration" as required by the sodomy statute. MCLA 750.159; MSA 28.356.

At trial the complaining witness testified that one night a few days after his arrival in the Muskegon County Jail, he awoke to find his blanket on fire. When he asked who had started the fire, defendant claimed that he had. Defendant then told the complaining witness that he thought he was good-looking and asked him to have sex with him. The complaining witness refused. Whereupon defendant and another inmate threatened to burn the complaining witness worse if he did not engage in sexual activities with them. The complaining witness still refused, and apparently nothing more was said or done that night or the next morning. Then:

*"(Complaining witness):* And then come night again, and this time they pulled me out of bed.

"*Q. (People's attorney).* Who did?

"*A.* Wilbur Zinn and Jim Suits.

"*Q.* Okay.

"*A.* And told me I was either going to do it, or something was going to happen.

"*Q.* Did they say what was going to happen?

"*A.* Just said they was going to do something to me.

"*Q.* Did they specify?

"*A.* Either burn me or beat me up, or something.

"*Q.* At that point did you believe them?

"*A.* Yes.

"*Q.* At that point were you frightened?

"*A.* Yes.

*        *        *

"*Q.* Okay. What happened?

"*A.* I got down and Wilbur held me down, and Suits did it the first night.

"*Q.* What did Suits do?

"*A.* He had sex with me.

"*Q.* In what manner?

"*A.* He stuck his penis in my ass.

"*Q.* Okay. That was Suits that did that?

"*A.* Yes.

"*Q.* Zinn was holding you?

"*A.* Yes.

"*Q.* Anything else happen that night?

"*A.* No, after Suits got done, he told me to go back to bed, and if I said anything to anybody that something was going to happen to me.

"*Q.* Did he say what was going to happen?

"*A.* Just burn me or beat me up, or something.

"*Q.* Okay. So that's all that happened that night then?

"*A.* Yes.

"*Q.* Did anything happen the next day or the next night?

"*A.* Yes, nothing happened during the day. And the next night they pulled me out of bed again, and Suits

did it and Wilbur held me down. And then after Suits got done Wilbur did it, and Suits held me down.

"*Q.* What did Wilbur do?

"*A.* Stuck his penis in my ass.

"*Q.* So each of them did it that second time?

"*A.* Yes.

"*Q.* Okay. Did anything happen on the nights following that?

"*A.* The same thing.

"*Q.* How many nights did this happen?

"*A.* It happened about five nights in a row until I got to Deputy Porter.

"*Q.* All together *[sic]* Raymond, how many times did Wilbur Zinn do this to you?

"*A.* He did it three or four times.

"*Q.* And Suits?

"*A.* He did it the rest of the times, yes.

"*Q.* Okay. Do you remember the date that you finally talked to Deputy Porter?

"*A.* No, I don't.

"*Q.* How long had it been going on all together *[sic]* when you finally talked to Deputy Porter?

"*A.* About five days, five nights."

Another witness who had been an inmate during the period in question testified as follows:

"*A.* I was laying in my bunk, and Wilbur Zinn and Jim Suits sat up on Raymond Conklin's bunk, and talked to him for about 15 minutes.

"And then I rolled in a position where I could still see like this. (indicating) With my arm over my face like this.

"And I guess they thought I was asleep, because they put the blanket up over either Wilbur Zinn's bunk or Jim Suits' bunk. And all three of them got in there, and I heard the restling of clothing.

"And at the buttom *[sic]* the feet were sticking out. It looked like the pants were down off of Wilbur Zinn,

because he was on the far side. Conklin was in the middle and Suits and Zinn were each on a side.

"And then I heard a little bit of talking, and then Wilbur Zinn come out of the blanket, went over there and wiped himself off.

"Now, I couldn't tell for sure, but he apparently had his hands down there cleaning himself up. And I heard a noise like toilet paper against his skin.

"*Q. (People's attorney).* What did it appear he was wiping off?

"*A.* His privates, his penis or whatever you want to call it.

"*Q.* Okay.

"*A.* And he went back over there, got under the blanket about five or ten minutes, and then Jim Suits come out and did the same thing.

"And then Raymond Conklin went back to his bunk and went to sleep.

"And that's all I saw of that that night."

Finally, the inmate who had originally been charged as a co-defendant testified to the following:

"And as far as me seeing what Wilbur Zinn did, I did not see.

"I have had a sexual relationship with Raymond Conklin.

"But as far as me seeing Wilbur Zinn having a sexual relationship with him, I did not, because there was blankets up on the bed.

"*Q. (People's attorney).* Did you ever see Raymond Conklin and Wilbur Zinn get in the same bunk with the blanket?

"*A.* Yes.

"*Q.* It was over them?

"*A.* Yes.

"*Q.* And on more than one occasion?

"*A.* Yes.

"*Q.* And on one or more occasions had you just

yourself finished having sexual relations with Raymond Conklin?

"*A.* Yes.

"*Q.* And left behind the blanket?

"*A.* Yes.

"*Q.* And left Conklin in the bed?

"*A.* Yes.

"*Q.* And at that point did you see Wilbur Zinn get in the bunk with him?

"*A.* Yes."

The jury in this case was properly instructed on the issue of penetration. Defendant nevertheless argued that when the complaining witness made his blunt statement in answer to what had happened to him, he was using the word "ass" to mean "buttocks", and not "anus". This, says defendant, is a result of the fact that the term "ass" can be defined as either of the other two terms mentioned. Suffice it to say that, if that is so, then the jury was free to infer that the complaining witness truly meant "anus" when he testified. This would certainly be a reasonable inference. *People v Palmer,* 392 Mich 370; 220 NW2d 393 (1974). We hold that there was ample evidence to warrant a jury verdict of guilty beyond a reasonable doubt of the crime charged.

Defendant next urges a lack of specificity as to time in the information, the proofs, and the instructions to the jury as reversible error. If there was such a lack of specificity as to constitute error at the trial level in this case, then the trial court, upon proper objection, could certainly have cured such error. No objection was made. The trial court had no opportunity to even consider whether error was in fact present. We point out that time is not of the essence as to the offense charged. Further, defendant entered no alibi defense in this case. We

hold that no miscarriage of justice will result from our refusal to consider further defendant's objections at this time. They were therefore waived when not raised at trial. *People v Ballenberger,* 51 Mich App 353; 214 NW2d 742 (1974).

Defendant next alleges that the failure of the prosecution to comply with the provision of MCLA 766.11; MSA 28.929 both deprived the circuit court of jurisdiction to proceed in this case and prejudiced the defendant in the preparation of his defense. The statute provides for the transcription and filing in circuit court of the testimony taken at the preliminary examination. It is true that the circuit court does not acquire jurisdiction of a case until "the proper return is filed by the examining magistrate". MCLA 767.40; MSA 28.980. However, failure to file a transcript of the preliminary examination does not make the return improper in a jurisdictional sense. *People v Chambers,* 25 Mich App 188; 181 NW2d 61 (1970), *People v Early,* 25 Mich App 363; 181 NW2d 586 (1970). The right to such a transcript can be waived by failure to object to its absence, *People v Bell,* 26 Mich App 535; 182 NW2d 731 (1970), and an untimely filing of the transcript is reversible error only where there is a showing of prejudice. *People v Early, supra.*

In the instant case, defendant has failed to show how he was prejudiced by the fact that the transcript of the preliminary examination was not filed prior to trial. Defense counsel, although he knew that a preliminary examination had been held, failed to object to the lack of the filing of a transcript of that preliminary examination until after the first witness had testified at trial. When he did object he did so because it was his belief that the sole witness at the preliminary examina-

tion was not going to testify at trial, and that the prosecutor was going to enter the preliminary examination testimony itself into evidence. It is clear that had defense counsel needed the transcript to prepare for the trial itself, he would have asked for it before trial. Nevertheless, the trial court explained to the defense attorney that the preliminary examination testimony had been recorded on a disc using an Edison Voice Writer. He then offered defense counsel an opportunity to listen to that recording. Defense counsel ignored the offer and went on arguing his motion from a different angle. The court again offered to allow defense counsel time to listen to the voice disc, to which offer defense counsel replied:

"Your Honor, I would ask only for that privilege if Mr. Conklin does not testify, and the court would overrule my objection which I would make at that time.

*"The Court:* No, let's do it now. This case has been broken up Mr. Reider too much as far as it is. We have had the jury out all morning and part of the afternoon.

*"Mr. Reider:* Thank you, your Honor.

*"The Court:* You are at liberty to listen to the disc.

"We are in recess at this time."

As a matter of fact, after defense counsel had listened to the recording of the preliminary examination testimony the witness in question testified at trial. Therefore, the preliminary examination testimony was never offered into evidence as defense counsel had feared. After the testimony of that witness three more witnesses were examined fully by both counsel. The closing arguments were made, and the jury was instructed. The jury went out to deliberate, whereupon defense counsel renewed his objection to the failure of the filing of the transcript of the preliminary examination. He

claimed to have listened to the voice disc and found it incomprehensible in several places. Certainly, defense counsel should not have waited until that point in the trial to claim that he could not understand the recording. It is difficult to believe that a defense attorney who had been so vigorously objecting to the absence of a transcript would fail to immediately object in the event he could not understand a recording of the same subject matter.

Under the circumstances and facts of this case, defendant has failed to show any prejudice resulting from the failure to file a transcript of the preliminary examination. We do not hold that the statute has been complied with when a defense counsel has access to the taped record of a preliminary examination. We simply hold that the record in this case discloses no prejudice to this defendant resulting from noncompliance with the statute.

Defendant's last allegation of error is that certain witnesses were threatened by the prosecutor, and that this denied defendant a right to a fair trial. Both the witnesses mentioned in defendant's brief were prosecution witnesses. Both had made written statements prior to trial, and one of the witnesses had been the sole witness at the preliminary examination. At trial one of the witnesses did not want to testify because he had been threatened by the defendant. The other did not want to testify "because I got to live with these people". He attempted to take the Fifth Amendment although he was in no way implicated in the crime. The prosecutor had warned both of the witnesses of the penalties for perjury. The jury was aware of this in both instances. It was heavily stressed in cross-examination by defense counsel, but both witnesses maintained that they had not been in-

timidated when the prosecutor had reminded them of the penalties for perjury. Defense counsel did not move for a mistrial based on the alleged intimidation of the witnesses. Rather, he himself made it an issue of credibility.

The cases cited by defendant are all inapplicable to the facts in the instant case. They all concern intimidation of defense witnesses on the part of the prosecutor with the apparent aim of preventing the defense witness from giving testimony for the defendant. In the instant case, we are concerned with prosecution witnesses who had suddenly fallen under the mistaken belief that they were not bound to testify. When they communicated this belief to the prosecutor, he was certainly allowed to answer them and inform them that they were wrong. This was not error.

Affirmed.