# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

KENNETH WAYNE PETERS,

Defendant-Appellant.

UNPUBLISHED
March 24, 2015

No. 316332
Gogebic Circuit Court
LC No. 2012-000215-FC

Before: RONAYNE KRAUSE, P.J., and K. F. KELLY and STEPHENS, JJ.

PER CURIAM.

Defendant, Kenneth Wayne Peters, appeals by right his convictions by a jury of one count each of first-degree premeditated murder, MCL 750.316(1)(a), first-degree felony murder, MCL 750.316(1)(b), second-degree murder, MCL 750.317, and second-degree abuse of a vulnerable adult, MCL 750.145n(2). The trial court sentenced defendant to mandatory life imprisonment for first-degree murder[1] and to a concurrent term of 58 months to 15 years as a habitual offender for second-degree abuse of a vulnerable adult. This matter arises out of the death of the victim, EGP, defendant's wife who was 78 years old, 27 years his senior. EGP was suffering from early dementia. We affirm.

The victim's decomposed body was found in a wooded area in Watersmeet, Michigan, 48 miles from her home with potentially-debilitating drugs in her body for which she had no prescription but defendant was known to possess and use to control her. No direct evidence established that he murdered the victim, but considerable circumstantial evidence showed that he drove her to the woods and left her there with the reasonable expectation that she would not survive. Defendant asserts that the evidence was insufficient and that the trial court erred by admitting evidence of prior acts of domestic violence he perpetrated against the victim and against two of his former relationship partners. Due to the nature of the proofs in this matter and defendant's contention that the evidence was insufficient, we must necessarily recite the facts at some length.

---

[1] By agreement, his first-degree murder convictions were merged and his second-degree murder conviction set aside to avoid a double jeopardy violation.

The victim's first husband died in 2006, and shortly thereafter, the victim deeded her home, which was her only real asset, to herself and her daughter Milia jointly. Defendant met the victim in late 2010 through the snow plowing service he ran, and the two of them bonded over a love of NASCAR. Defendant moved in with her in mid-2011. According to defendant, they were always just friends, although others described the victim as resembling "a teenager in love." According to defendant, the victim was concerned about the possibility of her children putting her in a nursing home, although the victim's children testified that they never considered, or even discussed, any such possibility. Defendant testified that at the time he moved in, he was aware that Milia's name was on the deed to the house. However, he also testified, and numerous other witnesses confirmed that defendant had previously told them, that he and the victim had entered into a deal under which he would keep her from being put in a home and she would leave the house to him. Witnesses confirmed that defendant had indicated to them that he expected to receive the house from the victim.

Defendant testified that the victim had always been "a little forgetful," but he initially believed it to be "no big deal," and she could take care of herself other than some cooking tasks that defendant performed. It appears from the testimony that defendant and the victim were fairly social and had frequent visitors; otherwise, defendant lived in the basement of the victim's house and each of them did their "own thing." Shortly after the marriage, defendant travelled to Iowa for work, although he contended that he kept in daily contact with the victim. He emailed the victim a will that he drafted for her to sign, but she never signed it. In late 2011, the victim ran short of money because she sent defendant several hundred dollars to enable him to return to Michigan; a police officer and a social worker visited the victim and found her utilities cut off and a person who was apparently defendant's half-brother living there under an obligation to pay rent.

The victim indicated at the time that defendant was still in Iowa, but it later turned out that he had been in the basement. Defendant eventually turned himself in to the police for unpaid fines due to a prior DUI, and he spent thirty days in jail until mid-December of 2011, when he was released because he needed hernia surgery. While in jail, defendant discussed with a witness who was incarcerated with him his deal to acquire the victim's house, and also that "if you wanted to get rid of somebody that he could bring them out to the woods, bury (sic) a deep enough hole, and they'd never be found." Another witness lived with defendant and the victim in early 2012, while defendant was recovering from his hernia surgery, and testified that at some point in February, spoke about a Discovery Channel show which indicated how long it would take for a body in a hole to decompose in the woods.

Defendant testified that he believed the victim's memory problems got worse while he was in Iowa, and in January of 2012, he took her to a doctor, who diagnosed the victim with some mild cognitive impairment. Defendant testified that he learned that the victim had been diagnosed with dementia approximately five years previously, contrary to the doctor, who testified that he had only seen the victim once previously for blood pressure and to wean herself off of pain medicine. Defendant contacted the Upper Peninsula Commission for Area Progress (UPCAP), which assessed the victim and found her eligible for care assistance on the basis of moderate cognitive impairment, although the registered nurse who participated in the assessment noted that most of the information UPCAP received came from defendant. Numerous care workers from UPCAP visited the victim between the February 2012 assessment and the day she

-2-

went missing. For the most part, they consistently reported that the victim appeared reasonably happy and well-treated by defendant, although as time went on, she occasionally reported that defendant may have raised his voice at her or crossed his arms and treated her "like a baby." Some of them were uncomfortable around defendant, and one indicated that the victim reported frustration and irritation with defendant acting controlling and drinking too much.

One of the care workers, with whom defendant developed a personal friendship, testified that defendant repeatedly complained to her that the victim's condition was growing worse and more frustrating. This care worker also testified that defendant stated that he "'could just drop her off in the woods and leave her there'" and that no matter how tough she was, she would not survive "'if [he] dig[s] the hole deep enough and she meets the end of my shovel.'" She also testified that at one point, defendant explicitly told her that he was giving Ativan pills to the victim to make her sleep.[2] Another of defendant's social acquaintances also testified that defendant told her that he gave the victim six or seven Ativan pills to make her sleep. A visitor of defendant's shortly before the victim's disappearance discovered a large number of Ativan pills in defendant's bathroom. The victim's doctor testified that on April 16, 2012, defendant left him a telephone message saying that he felt he could no longer care for the victim due to her mental changes.

The next day, one of the other care workers observed that the victim had a scrape and bruising to her head and a black eye; the victim initially stated that she tripped and fell but provided two versions of how and stated that no one had done it to her. Defendant appeared agitated and stated that he had documentation showing that he was taking good care of her. Yet another care worker observed later that month that the victim had some bruising, and defendant claimed that the victim had been wearing the wrong glasses and fell. It is seemingly undisputed that she received the black eye during a camping excursion in Watersmeet on the wooded property belonging to Rebecca Risley and her boyfriend Daniel Cartner,[3] but although several witnesses were present, none actually saw her fall other, apparently, than defendant. One witness opined that defendant had shoved the victim and he observed that defendant "used to shove [The victim] a lot." He also testified that on one occasion, he saw defendant hit the victim with a nonfunctional chainsaw. Another witness expressed confusion as to how the victim could have fallen. Nonetheless, no witnesses testified that the victim had ever reported to them any physical violence by defendant.

In July of 2012, the victim visited a local attorney and brought with her two incomplete handwritten documents purporting to be a will naming defendant as her personal representative and sole beneficiary, which the victim professed to be confused by. The attorney advised her that it was important for her to make up her own mind and have the assistance of an attorney, and he had no further contact with her. Another of defendant's social acquaintances testified that

---

[2] Ativan is a brand name for the drug Lorazepam, a benzodiazepine class drug; it can be used as an anti-anxiety medicine, an anti-convulsive medicine, or as a sedative or tranquilizer. It is only available by prescription, and the victim did not have a prescription for it.

[3] The victim's body would eventually be found near their property.

during a visit in August of 2012, defendant would show him "two pieces of paper that was [sic] supposedly a last will and testament of The victim" that would give defendant "her benefits."

UPCAP re-assessed the victim on August 1, 2012, and found defendant to be "very upset" and of the opinion that the "deal" he had with her to care for her in exchange for the house was not being honored, and he was no longer able to deal with caring for her. Defendant "was rather in a foul mood" and apparently had just found out that "the house wasn't in his name or whatever." The victim appeared nervous. The UPCAP workers advised defendant that he could get the marriage annulled, leave, or put the victim in a nursing home; defendant replied that he would have no income and no place to live.

Later that day, defendant called the emergency line reporting that the victim was dizzy and bumping into things and needed an ambulance. Police and paramedics responded and took her to the hospital in an ambulance, along with a suitcase full of medications that defendant pointed out to them. Responders also noted that defendant appeared concerned about the victim but that he referred to himself as her caretaker rather than her husband. The emergency room doctor ran a number of standard tests and assessed the victim as "a relatively well looking 79-year-old lady" with no particular discomfort or specific issues other than "minimal" dementia, and he ultimately discharged her as having no discernible issues that would warrant hospital admission. He noted, however, that he found the suitcase full of medications surprising and impressive, even for a doctor with a considerable amount of experience. He opined that nothing about the victim suggested an overdose. The next day, two witnesses who were visiting defendant independently heard defendant remark that he would not be surprised if the victim did not fall down the stairs and break a hip.

On August 3, 2012, defendant called the local Citizens Bank claiming that his mother had just gotten out of the hospital and he was seeking to cash his mother's Social Security check. Defendant had an overdrawn personal savings account at the bank. The bank ultimately permitted him to cash $100 from the victim's check, but it required him to deposit the rest. The worker with whom defendant had a friendship drove him to the bank, and subsequently to a convenience store and Walmart; she testified that he was drinking gin from a purple coffee mug at the time. She testified that defendant "had stated many times that he was frustrated with the victim's condition" but on the drive to the bank, he "said that he was getting so frustrated with the victim, um, with her being forgetful, that he had said to me, 'I am just so frustrated. I could just drop her off in the woods and leave her there.'" The worker did not take him seriously and suggested that the victim was sufficiently tough to make it through something like that, to which defendant replied, "not if I dig the hole deep enough and she meets the end of my shovel" and "if you cover it with limestone then dogs can't smell it."

Meanwhile that day, the victim visited a credit union where she was a member and talked to an employee there, who recalled that the victim had an outstanding loan and that she complained that "everybody around [her]" told her she had dementia and that her husband had a "man cave" in the basement into which she was not allowed; the employee opined that the victim appeared somewhat bothered by defendant living in her house. That afternoon, the victim walked into the law offices of McKenzie and Talaska, where she was greeted by their receptionist, who talked with her for about half an hour. The receptionist testified that she appeared nervous and confused, and she expressed concern that defendant wanted to take

everything and put her in a nursing home, and he had already hidden her keys and all forms of identification.

That evening, a neighbor observed the victim's green truck, being driven by the victim with a man the neighbor presumed to be defendant in the passenger seat, drive west on US 2 toward Ironwood, some time before it was fully dark out. A worker at the Bessemer British Petroleum (BP) station observed the victim drive her truck into the lot between 7:30 p.m. and 8:00 p.m., where the victim and defendant switched seats, and drive away in the direction of Watersmeet, which was about 45 miles away. The video surveillance system at the station recorded the exchange and confirmed the time. That was the last time the victim was seen alive.

Defendant testified that he had proposed to the victim that they go for a ride to drive past some retirement homes and that he and they usually switched seats in that manner because a neighbor who knew he did not have a valid license would call the police on him if he was driving. He estimated that they returned to the victim's home at about 9:00 p.m. Defendant left the victim in her chair, where he set out some coffee and goulash for her, to go camping. He testified that he camped in the back of the truck on the Black River and got somewhat wet because there was a thunderstorm that night and the tarp he put over the truck bed developed a hole. He testified that when he returned home, the victim was not in her chair, so defendant initially assumed she was in her bedroom, but she proved not to be when he later attempted to ask her if she wanted breakfast. He then began looking for her.

Meanwhile, Risley and Cartner were staying at the Advance Motel in Ironwood; they checked in on August 1 and would not check out until August 8. The neighbor who lived next door to Cartner's cottage in Watersmeet testified that a dark pickup truck pulled into Cartner's driveway at 8:30 to 9:00 p.m. on August 3. At around 11:00 p.m., he noticed a large bonfire going on the Cartner property despite knowing that Cartner had not been there for several days. He could not see anybody, just the fire and the truck, and by the morning, the truck was gone. Cartner testified that when he later returned to his cottage, he noticed that the fire pit had been used, a log he had been saving had been burned, and there was garbage on the lawn that included a milk carton and a cup that they threw away. Risley further stated that the mug was a purple coffee travel mug with a black top and a black bottom that had some kind of sweet drink left in it, and she kept it for a few days before throwing it out because she intended to wash it. She further testified that her and Cartner's initial thought was that the only person of whom they were aware who was familiar with the fire pit and area who had a vehicle was defendant, but they believed he would not have come out without letting them know.

Various witnesses in various locations testified that defendant showed up looking for the victim, although defendant expressed an opinion that she was "'probably off on one of her sprees.'" One witness noted that the victim "never went on her little sprees at night" and called the police. The dispatcher who took the call checked with the hospital and found that the victim was not there; on the basis of what she learned from that witness, "previous contacts we had with both the victim and [defendant] over the last few months," and defendant advising her that he did not intend to make a missing person's report, she entered the victim into the police computer system as a missing senior at 2:59 am on August 5. Later that day, a witness heard defendant say something about wanting to make a body disappear, but the witness dismissed it as bluster.

An extensive, multi-jurisdictional search operation was commenced over several days, including the use of two bloodhounds. Defendant was interviewed by the police; during the interview, defendant opined that the victim was unlikely to have gone to the Watersmeet area, and he got more unresponsive to questions that got closer to involving Watersmeet. Ultimately, the victim's body was discovered by accident by Risley when she drove a four-wheeler down a path from their cottage after dark. When she got to a turnaround, on the path, she "saw something . . . white and bloated and so I did not recognize that it was a person," which "freaked [her] out." After determining that they had found a body, Risley and a friend went to the nearest house and called 911. Subsequent bloodhound investigation of the scene determined that defendant had been in the area and left by vehicle, although it was possible that the dog could have picked up a scent from as much as six to ten weeks previously. The dog tracked the victim's path as well and determined that she had wandered around the area in circles, down a ravine, and into underbrush.

Subsequent forensic investigation revealed that the victim's body had been there for at least a week, but no evidence of trauma or heart attack and no alcohol that could not be attributed to the decomposition process. It also revealed detectible levels of several drugs, including Ativan. The amount of Ativan in the victim's body at the time of her death was well below a therapeutic dose, but depending on how long she had been wandering between ingesting it and her death, the initial dose could have been anywhere from 220 ng/ml to 750 ng/ml. A therapeutic dose was 140 to 240 ng/ml and a likely-fatal dose would be in excess of 1000 ng/ml. The victim was determined to have died of hypothermia some time between August 3 and August 5, 2012.

On August 14, 2012, defendant was re-interviewed at the victim's home, where he stated that he had left between 6:00 and 7:00 pm, leaving the victim in her chair, possibly gotten gas, but otherwise then drove directly to Black River, camped there overnight, and returned home between 5:00 and 6:00 am to discover the victim missing. The police explained to defendant that they had video evidence proving otherwise, which defendant denied. Defendant was then informed that the victim had been found and was deceased. Defendant opined that he had no idea how she could have gotten there, her only possible transportation being UPCAP workers, himself, or possibly a neighbor; he did not suggest the possibility that she had driven herself. Furthermore, he suggested that perhaps she had walked off into the woods, at which time it was pointed out that woods had not been mentioned. Defendant initially protested that they had told him that she was found in the woods, however then stated that the officers had stated she was found on Beaver Station Road and he knew there was "nothing but woods out there." The officers also presented evidence of the purple mug. Defendant was arrested.

Defendant's cellmate in early December of 2012 became "intrigued" by defendant's case. The cellmate testified that defendant ultimately confessed that he had made a "couple mistakes" and there was "some evidence that's real damning to the case that [he wanted] [the cellmate] to help [him] out with." Defendant specifically identified the BP video and his purple mug, and he wanted help fabricating an alibi in the form of an anonymous letter claiming to be from someone who picked the victim up at the Citgo station in Bessemer and took her to Watersmeet at her request. Defendant typed up a couple of letters for the cellmate to send, but instead of memorizing and disposing of the letters, he kept them and carried them out of jail. Defendant admitted that he wrote the letters, and he testified that he did so because he was scared and

believed that the police were fabricating evidence against him. The cellmate also testified that defendant directly admitted to him that he drove the victim to Watersmeet and left her, although insisting that he did so out of frustration and being drunk rather than wanting the victim to die. Defendant testified that he never confessed anything.

Over defendant's objection, testimony of three prior incidents of domestic violence he perpetrated were introduced into evidence. The first incident involved the victim's black eye, discussed *supra*. The second incident involved a former relationship partner who also used to work with defendant and lived with him in early January of 2010. She described defendant as abusive and controlling to the point of forbidding her from having a phone, talking to anyone, or even seeing her son. She testified that he would smash any phone she had and yell at or hit her if she had anything to do with her child. He took all of the checks she earned from her full-time job at Bessemer Plywood, and he did not pay her for the work she did for him. She explained that she "was young and dumb at the time" but "grew up and [knew] better than to get in those kinds of relationships; eventually she headbutted him, causing him some considerable injury despite the fact that she was only 102 pounds and 21 at the time, and she subsequently threatened to shoot him if he attempted to contact her. However, she noted that he had previously threatened "that if [she] didn't do what he wanted that he'd kill [her] and get rid of [her] somehow or another," which she took to be a serious threat.

Third, Risley testified that she and defendant had been in a relationship and resided together between 2007 and 2009. She stated that at the beginning, their relationship "seemed all great and wonderful" and defendant "just seemed like just the sweetest person and just, gosh, pretty much everything that anybody would want in an individual, a really good talker" but degenerated into a jealous and extremely controlling person. She noted that he was extremely verbally abusive, that she "lost two jobs because of him stalking [her] and hounding [her] at work and not leaving [her] alone and leaving [her] alone on the phones even when [she] was with him". She testified that it also got "extremely physical," including slapping her across the face, throwing her to the ground, and choking her. Eventually on one occasion she succeeded in "grabb[ing] him by his private parts" and biting him on the arm and running away; on that occasion she called the police, which ultimately resulted in defendant pleading guilty to a charge and spending six months in jail. She testified that even into 2012, he continued pursuing her and "would get mean" when she ignored his calls, something that "never stopped since the day that I met him." A mutual acquaintance testified that defendant "was always wanting to call [Risley], talk to her, see her. I guess you could call it stalking. I'm not sure, but he was always trying to keep in contact with her."

Among other arguments, defendant asserted that he had no motive to kill the victim, knowing he would be immediately evicted from the house and having no other source of income. The jury found defendant guilty as described *supra*. This appeal followed.

We review a challenge to the sufficiency of the evidence de novo. *People v Meissner*, 294 Mich App 438, 452; 812 NW2d 37 (2011). In reviewing a challenge to the sufficiency of the evidence supporting a criminal conviction, we consider the evidence presented to the jury in the light most favorable to the prosecution, including any circumstantial evidence or reasonable inferences, to determine whether the trier of fact could find therefrom that all of the essential elements of the charged offense were proven beyond a reasonable doubt. *People v Williams*, 294

Mich App 461, 471; 811 NW2d 88 (2011). In making that review, we may not independently weigh the evidence or attempt to evaluate the credibility of witnesses or otherwise purport to determine whether the trier of fact *should* find the evidence sufficient, but rather only whether the trier of fact *could* so find. See *People v Palmer*, 392 Mich 370, 375-377; 220 NW2d 393 (1974). "All conflicts in the evidence must be resolved in favor of the prosecution." *People v Kanaan*, 278 Mich App 594, 619; 751 NW2d 57 (2008). "Circumstantial evidence and reasonable inferences arising from the evidence may be sufficient to prove the elements of a crime." *People v Lugo*, 214 Mich App 699, 710; 542 NW2d 921 (1995).

"In order to convict a defendant of first-degree murder, the prosecution must prove that the defendant intentionally killed the victim and that the act of killing was premeditated and deliberate." *People v Kelly*, 231 Mich App 627, 642; 588 NW2d 480 (1998). "The elements of felony murder are (1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result, (3) while committing, attempting to commit, or assisting in the commission of any of the felonies specifically enumerated in [MCL §750.316]." *Id*., 642-643. A defendant's actions must be more than just the "but for" cause of the victim's death, but also the reasonably foreseeable natural result of the defendant's actions. *People v Schaefer*, 473 Mich 418, 435-439; 703 NW2d 774 (2005). The requisite specific intent to kill may be inferred from circumstantial evidence or from a defendant's conduct or words. *People v Mack*, 112 Mich App 605, 611; 317 NW2d 190 (1981); *People v Eggleston*, 149 Mich App 665, 668; 386 NW2d 637 (1986).

Defendant, while asserting that he is in fact innocent, explicitly concedes that when the evidence is viewed in the light most favorable to the prosecution, the evidence supports the jury finding that he drove the victim to Watersmeet, contrary to his original narrative in which he went camping and left her at home only to return to her missing. We agree with that concession and would have so found had he not made it. Defendant does not explicitly concede, but by necessary inference must, that the evidence therefore also supports a finding that he *left* the victim in Watersmeet, as we also would have independently found. He argues that what is lacking is sufficient evidence that he acted with the specific intent that the victim would die as a result of his conduct. We disagree.

The victim had a non-negligible level of Ativan in her body, likely from ingesting a significant dose thereof before she died. Notably, defendant had a significant quantity of Ativan and an admitted propensity for giving it to the victim to control her behavior, and she had no prescription for Ativan. The evidence strongly supports an inference that defendant gave Ativan to the victim before abandoning her, at night in the woods. Defendant asserts that the time of year and her warm clothing suggested that hypothermia was not a highly predictable manner of death, but the exact manner of death need not be intended. An elderly person with early dementia and disorienting drugs in her body, alone in unfamiliar deep woods in northern Michigan at night can reasonably be predicted to have poor prospects for survival, particularly in

light of the rainy weather at the time.[4]  Furthermore, defendant's actions after abandoning the victim, in which he put on a seemingly over-the-top dramatic performance of searching for her in Bessemer and other places he knew she was not present and discouraging searches where he knew she would be located, is strong evidence that defendant did, in fact, not only anticipate but intend that the victim would not survive.

The evidence presented in this case may have spanned seventeen days of trial, but this is at heart not a complicated case.  The evidence of defendant's involvement in and engineering of the victim's death need not all be direct, and murder need not be achieved with direct physical violence.  The evidence presented amply supports a finding beyond a reasonable doubt that defendant drove the victim to the woods in Watersmeet, drugged her with possibly a near-fatal dose of Ativan, and abandoned her with the intent and reasonable expectation that she would die in there, irrespective of whether that death might occur due to hypothermia, the drugs or other causes.  Consequently, defendant's first-degree murder conviction must be upheld.

Secondarily, defendant argues that the trial court should not have admitted the evidence of his other acts of domestic violence.  We disagree.  The trial court's decision whether to admit evidence is reviewed for an abuse of discretion, but preliminary legal determinations of admissibility are reviewed de novo.  *People v Gursky*, 486 Mich 596, 606; 786 NW2d 579 (2010).

"Domestic violence" is defined, in relevant part, as causing physical or mental harm to a spouse under circumstances not involving self-defense.  See MCL 768.27b(5)(a)(*i*) and (b)(*i*). Obviously, murdering one's spouse would constitute an act of domestic violence.  See *People v Wilson*, 265 Mich App 386, 393; 695 NW2d 351 (2005) ("Domestic violence is not a specific crime, but a description of circumstances surrounding a violent crime in which the perpetrator and the victim have a preexisting relationship that may be categorized as a 'domestic' relationship").  Because defendant was charged with a crime "involving domestic violence, evidence of the defendant's commission of other acts of domestic violence[5] is admissible for any purpose for which it is relevant, if it is not otherwise excluded under Michigan rule of evidence 403."  MCL 768.27b(1).  Defendant properly does not attempt to argue that the evidence of his prior acts of domestic violence were inadmissible under the statute, but rather that they should have been inadmissible pursuant to MRE 403.

Pursuant to MRE 403, evidence that is otherwise admissible may be excluded if, in relevant part, "its probative value is substantially outweighed by the danger of unfair prejudice." Defendant argues that the evidence here should not have been admitted because the acts of

---

[4] It is a matter of common experience that clothing that is warm and insulative when dry will not necessarily retain those qualities when wet, and the evidence did not suggest that the victim was wearing any clothing appropriate for inclement weather.

[5] Pursuant to MCL 768.27b(4), any such acts that occurred more than 10 years previously would only be admissible if the trial court determines that doing so is in the interest of justice, but no such older acts were at issue in this matter.

domestic violence involving his prior relationship partners were very different from the alleged acts of domestic violence against the victim and because the highly circumstantial nature of the case against him made such inflammatory testimony unfairly damaging. Defendant also argues that the trial court failed to apply *People v Watkins*, 491 Mich 450; 818 NW2d 296 (2012). However, *Watkins* largely involved inquiring into whether MRE 403 applied to MCL 768.27a, which, unlike MCL 768.27b, contained no explicit statutory requirement to that effect. See *Watkins*, 491 Mich at 481-486. The trial court here considered MRE 403, so *Watkins* is irrelevant except insofar as it provides a list of factors to consider when applying the rule of evidence.

We anticipate little disagreement with the general principle that murdering someone is an act of greater magnitude than beating someone. Both, however, are acts of serious physical violence. Furthermore, even we presume they are dissimilar in some importantly relevant way, dissimilarity is only a consideration, *Watkins*, 491 Mich at 487, however it is not preclusive. *People v Meissner*, 294 Mich App 438, 451-452; 812 NW2d 37 (2011). Importantly, the evidence of defendant's prior domestic violence was not introduced in a particularly inflammatory manner, but it was *highly* relevant to showing a pattern of behavior on defendant's part. In particular, it showed that defendant had a habit of presenting himself as a wonderful human being to individuals who were not psychologically completely self-sufficient, becoming parasitic and controlling, and becoming violent when frustrated. Although evidence that defendant beat the victim was not overwhelming, there was ample evidence that he was controlling, and his resort to violence to resolve his frustration was precisely what his charges in the present case involved. Finally, the trial court emphasized to the jury that defendant was not on trial for any other acts of domestic violence and must not be convicted on the basis of a finding that he had perpetrated any such prior acts. The trial court did not abuse its discretion by admitting the evidence.

Affirmed.

/s/ Amy Ronayne Krause
/s/ Kirsten Frank Kelly
/s/ Cynthia Diane Stephens

-10-