# STATE OF MICHIGAN

# COURT OF APPEALS

BEVERLY KNOX-PIPES,

Plaintiff-Appellee,

v

GENESEE INTERMEDIATE SCHOOL
DISTRICT and LISA HAGEL,

Defendants-Appellants.

UNPUBLISHED
September 24, 2015

No.  322295
Genesee Circuit Court
LC No.  11-097246-CK

Before:  MURRAY, P.J., and METER and OWENS, JJ.

PER CURIAM.

Defendants, Genesee Intermediate School District (GISD) and Lisa Hagel, appeal as of right from an April 9, 2014 judgment in favor of plaintiff, Beverly Knox-Pipes, entered by the trial court following a jury trial.  Plaintiff was awarded a total of $760,000 in economic and noneconomic damages for claims of violations of the Whistleblowers' Protection Act (WPA), MCL 15.361 *et seq*, and breach of contract.[1]  For the reasons discussed later, we reverse the trial court's denial of summary disposition for the Whistleblowers' claim, and we reverse and remand to the trial court for a new trial for the breach of contract claim.

## I.  FACTS AND PROCEDURAL BACKGROUND

Plaintiff was the Assistant Superintendent for Technology and Media Services and also served as the Executive Director for Genesee Network for Education Telecommunications (GenNET).  GenNET was a consortium that served over 20 school districts in Genesee County and the GISD.  Plaintiff was responsible for supervising the daily duties of the technology department, which included distributing cell phones and other GISD technology.  In 2010, GenNET and the GISD became involved in litigation with Clio Schools, who claimed that it and other school systems, through their various contracts with GenNET and the GISD, were being forced to pay "bloated and unnecessary costs" incurred by the GISD ("GenNET lawsuit").

---

[1] Plaintiff also brought a claim for gender discrimination under the Elliot-Larsen Civil Rights Act, MCL 37.2101 *et seq*, for which the jury found no cause of action.  Accordingly, that claim will not be addressed in this opinion.

-1-

Plaintiff was listed as a witness in that litigation, was a potential deponent, and provided an affidavit.

Plaintiff alleged that Lisa Hagel, the superintendent of the GISD, suspected that the Clio Schools' allegations were correct, so she devised a plan to conceal information from Clio Schools. Plaintiff alleged that Hagel did not think that she could persuade plaintiff to lie with her. Plaintiff alleged that Hagel's distrust of plaintiff as witness in the GenNET lawsuit was evident by remarks Hagel made. Plaintiff alleged that Hagel falsely accused her of misusing $480 worth of telephone equipment in an effort to unlawfully terminate plaintiff. Plaintiff also alleged that Hagel threatened to disclose plaintiff's extramarital affair with Thomas Svitkovich, the superintendent emeritus, if she did not resign. Plaintiff alleged that Hagel's actions were an attempt to force plaintiff to resign to cover up Hagel's own unlawful conduct of concealing information from Clio Schools.

Plaintiff alleged that after initiating this action, Hagel then hired Plante Moran to conduct an audit and "spoon-fed" it misinformation that led to false findings and charges against plaintiff so that Hagel could (1) cover up her unlawful conduct in the GenNET lawsuit, (2) retaliate against plaintiff for not resigning, and (3) retaliate against plaintiff for filing this action. Plaintiff also alleged that her employment contract could only be terminated if she engaged in conduct that amounts to "moral turpitude," which she alleged she did not. Therefore, her firing was a breach of her employment contract.

Defendants, on the other hand, argued that plaintiff was terminated because of her misconduct. Specifically, it was discovered that plaintiff had given Svitkovich, a nongovernment employee, a cell phone that was paid for by the GISD. Defendants alleged that pursuant to the GISD's policies, district equipment could not be loaned unless approved by the superintendent. In this case, Hagel claimed that she did not give approval for Svitkovich to use a cell phone. This became known while the GenNET lawsuit was pending. Defendants claimed that this was significant because Clio Schools were claiming that it was forced to incur unnecessary costs through the GenNET consortium. Specifically, GenNET is funded by the local school districts and is based on a pricing model, which Hagel explained is the cost of salary, benefits, and technology needed to operate the system. The costs are divided amongst all the districts. Defendants alleged that cell phones are included in these costs. Therefore, when plaintiff gave Svitkovich the cell phone, it was paid for by the local school districts. Hagel claimed that because this was the very issue that Clio Schools was suing GenNET for, she placed plaintiff on paid administrative leave in October 2011.

Defendants alleged that once plaintiff was placed on administrative leave, further investigation revealed that she had been having an extramarital affair with Svitkovich. Defendants alleged that plaintiff used the cell phone to advance the affair. Defendants further alleged that plaintiff was forwarding confidential information to Svitkovich and falsified her evaluation. At a meeting held in November 2011, Hagel claimed that she provided plaintiff the opportunity to resign quietly. As a result, plaintiff initiated this action in December 2011. Defendants then hired Plante Moran to conduct an audit in defense of plaintiff's action, which defendants alleged revealed, among other things, that plaintiff engaged in a pattern of improper travel at the taxpayer's expense. Therefore, based on the information from Hagel and the

investigation by Plante Moran, the Board of Education voted to terminate plaintiff effective August 2012.

Following discovery, plaintiff moved for partial summary disposition as to liability for the following claims: (1) the type two WPA claim for participation in this action, (2) the type two WPA claim for plaintiff's participation in the GenNET lawsuit, and (3) the breach of contract claim. Defendants also moved for summary disposition on all of plaintiff's claims. The trial court denied summary disposition regarding the Whistleblowers' claim for participating in the GenNET lawsuit, but granted summary disposition for defendants regarding the Whistleblowers' claim for participating in this action.[2]

Following numerous motions in limine filed by defendants, the case proceeded to trial where the jury found for plaintiff on both the Whistleblowers' claim and breach of contract claim. For the Whistleblowers' claim, plaintiff was awarded $320,000 for present economic loss, $320,000 for future economic loss, $85,000 for present noneconomic loss, and $35,000 for future noneconomic loss, totaling $760,000. She was awarded $320,000 in economic damages for her breach of contract claim, but would not recover more than the $760,000 since the claims had duplicate elements. Consequently, this appealed ensued.

## II. SUMMARY DISPOSITION

### A. WHISTLEBLOWERS' CLAIM

First, defendants argue that the trial court erred by denying their motion for summary disposition as to the Whistleblowers' claim. We review de novo a trial court's decision on a motion for summary disposition. *Hoffner v Lanctoe*, 492 Mich 450, 459; 821 NW2d 88 (2012). "A motion under MCR 2.116(C)(10) tests the factual sufficiency of the complaint." *Maiden v Rozwood*, 461 Mich 109, 119; 597 NW2d 817 (1999). In reviewing the motion, we consider "the pleadings, admissions, and other evidence submitted by the parties in a light most favorable to the nonmoving party." *Latham v Barton Malow Co*, 480 Mich 105, 111; 746 NW2d 868 (2008). Summary disposition is properly granted "if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Id.* A genuine issue of material fact exists "when reasonable minds could differ on an issue after viewing the record in the light most favorable to the nonmoving party." *Allison v AEW Capital Mgt, LLP*, 481 Mich 419, 425; 751 NW2d 8 (2008).

The WPA, MCL 15.362, provides,

An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated

---

[2] This ruling is not contested on appeal, and therefore, will not be discussed.

pursuant to law of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action.

To establish a prima facie case under the WPA, a plaintiff need only show that (1) he or she was engaged in protected activity as defined by the act, (2) he or she suffered an adverse employment action, and (3) a causal connection exists between the protected activity and the adverse employment action. *Whitman v Burton*, 493 Mich 303, 313; 831 NW2d 223 (2013).

The plain language of the statute provides protection for two types of 'whistleblowers': (1) those who report, or are about to report, violations of law, regulation, or rule to a public body, and (2) those who are requested by a public body to participate in an investigation held by that public body or in a court action. *Henry v Detroit*, 234 Mich App 405, 409; 594 NW2d 107 (1999).

Plaintiff claimed that defendants retaliated against her for participating in the GenNET lawsuit, thereby making her a type two whistleblower. Defendants' main argument on appeal is that plaintiff never participated in the GenNET lawsuit because she was not deposed, and her unsupported allegation that she gave an affidavit was insufficient to show she actually participated in a court action. Contrary to defendants' argument, however, plaintiff was not required to give testimony at her deposition, or even write an affidavit to be considered a type two whistleblower. *Shaw v Ecorse*, 283 Mich App 1, 11-12; 770 NW2d 31 (2009). Rather, an employee is protected simply by being *requested* to participate in an investigation, hearing, inquiry, or court action. MCL 15.362. There is no requirement that the employee actually participate. See *Shaw*, 283 Mich App 12 ("Provisions not included in the statute by the Legislature should not be included by the courts."); M Civ JI 107.02 (instructing that a request to participate is protected activity even if the employee does not actually participate). Therefore, whether or not plaintiff actually provided an affidavit or deposition testimony is irrelevant. Plaintiff engaged in protected activity when she was requested by a public body to participate in a court action, i.e., when she was listed as a witness and her deposition was scheduled or when she provided an affidavit at the request of her employer.

Once plaintiff established that she engaged in protected activity, i.e., being requested to participate in the GenNET lawsuit, plaintiff was then required to show a causal connection between her termination and her request to participate in the GenNET lawsuit. Plaintiff was required to show that defendants "took adverse employment action *because of* plaintiff's protected activity" or that the action "was in some manner influenced by the protected activity." *West v Gen Motors Corp*, 469 Mich 177, 185; 665 NW2d 468 (2003).

In opposing summary disposition, plaintiff relied on notes Michael Moorman, the GISD's Human Resources Director, took during a meeting between Hagel and plaintiff regarding plaintiff's actions, to argue that Hagel was displeased with plaintiff's participation in the GenNET lawsuit and that is why she was terminated. Even when viewed in a light most favorable to plaintiff, a review of the notes and the deposition testimony explaining those notes, shows that Hagel was not displeased with plaintiff's participation in the GenNET lawsuit.

Rather, Hagel was displeased with the fact that plaintiff gave Svitkovich a district-paid cell phone and forwarded Board documents and attorney-client information to him in the midst of the lawsuit.

For example, during the meeting Hagel told plaintiff, "There is a group of us trying to defend you and GenNET. This is a slap in the face." Hagel testified that there was a group comprised of attorneys and the executive Board of GenNET devoting time to resolve the lawsuit with Clio Schools. Hagel testified that some of the local district superintendents were criticizing plaintiff and alleging that she could not be trusted, that she did not follow-up with inquiries, and that she did not listen. According to Hagel, the Board and attorneys were working hard to support plaintiff and defend her and GenNET. So it "was a slap in the face" to learn that in turn plaintiff was forwarding attorney-client information, such as proposed settlement resolutions that the Board and the attorneys were trying to keep internal, to Svitkovich, who was "kind of responsible" for the lawsuit. Hagel admitted that she was very displeased with the fact that plaintiff was forwarding information to Svitkovich who was not involved in the lawsuit because "you can't share this attorney-client privileged information if we're going to resolve a lawsuit that's based on a district perceiving that they can't trust an entity."

During the meeting, Hagel also stated, "If one sup finds out our credibility goes out the window." Hagel testified that the GISD's technology department was highly criticized for their customer service and Hagel, and others, were working hard to improve its credibility. She testified that if the local school districts found out that plaintiff was forwarding internal information to Svitkovich, who the districts did not trust, then the GISD would lose its credibility. Likewise, Moorman understood that the statement referred to the fact that if the local school districts, who fund GenNET, found out that plaintiff, who was the executive director of GenNET, was passing out or abusing GISD-owned equipment at the local districts' expense, it would hurt the GISD's credibility.

Hagel also explained that her statement made during the meeting that "I feel so betrayed on a personal and professional level," meant that she and plaintiff had a quality working relationship and both valued trust, so she felt hurt by plaintiff's sneaky actions.

Further, plaintiff highlighted Hagel's statement made during the meeting that "[w]e developed a plan of attack. You remember I brought you in and told you these are the things that we need to work on, and that the sups are saying its either GenNET or BKP. I have copies of emails with information that should not be going out." Plaintiff asserted that the "plan of attack" referred to Hagel's plan to conceal information from Clio Schools, which plaintiff did not want to be a part of. Hagel, however, testified that

> we developed a plan of attack because I did have people coming to me and say you need to make a choice, you either fix Beverly, get rid of Beverly, or GenNET is going to dissolve, this is not working. Beverly and I had many conversations about things that were not going right in Technology, were not going right with vendors, complaints that people had shared, finally nothing was happening, we had a meeting and I put it in writing and we came up with a plan and this is worded attack or plan of improvement, plan of help, of ways that she could develop her skills, help build credibility, bring her staff in, educate her staff, work

-5-

more closely with vendors that would make her successful immediately in the eyes of local districts so she would be successful.

Hagel testified that she renewed plaintiff's contract in September 2011 because she felt that plaintiff had the skills and experience to be successful—that is why they were working on the improvement plan. Moorman testified that he also thought "plan of attack" meant that plaintiff and Hagel had been working on some goals and other things that needed attention. Further, plaintiff testified that in October 2010, Hagel provided plaintiff with a letter outlining some areas of improvement for plaintiff, specifically "bringing the districts of Genesee County back into a leadership mode in technology."

Finally, plaintiff highlighted Hagel's statement made during the meeting that "So far the investigation has been very self-directed, trying to keep it as quiet as possible." Hagel explained that she tried to conduct a majority of the investigation into plaintiff to keep it quiet for plaintiff's sake.

The only "direct" evidence that showed Hagel terminated plaintiff because of her request to participate in the GenNET lawsuit was an unsigned, undated statement plaintiff herself wrote in response to a July 17, 2012 letter from Hagel informing plaintiff of the charges against her supporting her termination. In that statement, plaintiff claimed: "Hagel was critical of my involvement in the GenNET/Clio lawsuit and the way I was going to testify," and that Hagel used the investigation to threaten plaintiff into resigning, and when she did not, she was terminated. But when viewed with all the other evidence, this statement does not create a question of material fact. Even when examining the notes alone, without Hagel's explanation, it is clear that Hagel was critical of plaintiff's involvement only because her actions amounted to alleged misconduct that could cost the GISD. There is no indication, as plaintiff suggests, that Hagel terminated plaintiff before her deposition was taken because of her distrust of plaintiff as a witness in the GenNET lawsuit, particularly where plaintiff claims she did nothing wrong and would not have provided testimony unfavorable to defendants. Rather, Hagel was clearly upset that plaintiff was abusing GISD-owned equipment at the local districts' expense, which is the very thing that Clio Schools was countersuing the GISD and GenNET for. Accordingly, even when viewed in a light most favorable to plaintiff, there is no evidence that Hagel terminated plaintiff *because of* her request to participate in the GenNET lawsuit.[3] Rather, she was

---

[3] Notably, the GenNET lawsuit was initiated in 2010, and plaintiff wrote an affidavit for the lawsuit on October 29, 2010. Her contract was renewed in September 2011, which included an increase in pay. She was placed on administrative leave in October 2011, but not terminated until August 2012. The lengthy period between her request to participate in the GenNET lawsuit and her termination, and the fact that her contract was renewed during that period, precludes an inference of retaliation. *Aho v Dep't of Corrections*, 263 Mich App 281, 291; 688 NW2d 104 (2004) ("Courts have consistently held that a lengthy period between the protected activity and the adverse employment action precludes a nexus between the [protected activity and adverse action.]").

-6-

terminated for her alleged misconduct for providing a nongovernment employee with a government-paid cell phone.

Nevertheless, plaintiff argues that her act of providing Svitkovich the cell phone and documents was protected activity because she participated in the court action by using the cell phone and emails to discuss the GenNET lawsuit with Svitkovich. Plaintiff testified that she forwarded the attorney-client communications to Svitkovich because it was her understanding that he was still a part of the GenNET lawsuit, in that he was a person to be deposed and "was also an active participant historically." Plaintiff testified that she felt, in her professional opinion, that Svitkovich had the knowledge base that would help the GISD and GenNET.

The WPA makes clear that protected activity is where "an employee is requested by a public body to participate in . . . a court action." MCL 15.362. However, plaintiff's actions of providing a cell phone and documents to Svitkovich, even if to discuss the GenNET lawsuit, were not protected activity, as they do not involve participation *in a court action* at the request of a public body. See *Henry*, 234 Mich App at 412-413 (stating that providing deposition testimony is participating in a court action because the plaintiff is subpoenaed and compelled to testify). Other than to state that she was merely discussing the GenNET lawsuit with Svitkovich, there is no evidence to suggest that these communications were necessary to, or part of, the court action. Because plaintiff's actions were not protected activity, she again fails to establish a prima facie case under the WPA.

Plaintiff also argues on appeal that there were actually two claims involving a type two whistleblower that were submitted to the jury: (1) retaliation for participating in the GenNET lawsuit, which has already been discussed, and (2) retaliation for participating in the school's investigation regarding plaintiff's continued employment.

Contrary to plaintiff's argument, she never alleged that she was fired for her participation in the school's investigation into her continued employment. Rather, she alleged that she was terminated because of the way she participated in the present action—a claim that was dismissed by the trial court and which is not contested on appeal. Plaintiff points to paragraph 43 of the Second Amended Complaint, which reads,

> (43) That Defendant Hagel herself, in writing no less (!!), in what can only be termed a smoking gun admission pursuant to MRE 801(d-2), has admitted that one of the reasons Beverly Knox-Pipes' employment was terminated was because of the way she participated in this very lawsuit, namely, the way she answered interrogatories and the way she communicated, through her attorneys, with Defendant Hagel:
>
>> "Your responses to the initial inquires in October and November of <u>2011 as well as your discovery answers and statements provided by your attorney on July 24, 2012 entitled "Statement of Beverly Knox-Pipes" and your attorneys' response on August 6, 2012 have</u> all been considered by myself in rendering my recommendation.

> Based upon my review of the evidence and your responses, it is <u>my recommendation</u> that your employment with Genesee Intermediate School District <u>be terminated</u> pursuant to the attached charges."

It is clear that plaintiff never alleged that she was terminated based on her mere participation in the investigation. Because plaintiff never specifically alleged a claim for retaliation based on her participation in the school's investigation regarding her alleged misconduct, summary disposition was appropriate.[4]

Additionally, even if plaintiff properly pleaded this claim, she failed to establish a causal connection between her mere participation in the investigation and her termination. Based on Hagel's statement that plaintiff cited, Hagel merely said that she considered plaintiff's responses during the two meetings and the other information uncovered during the internal investigation in deciding to terminate plaintiff. Hagel did not say that she fired plaintiff because of her participation in the investigation.[5] Rather, it was plaintiff's alleged wrongdoing uncovered during the investigation that led to her termination. See *West*, 469 Mich at 187 ("The fact that a plaintiff engages in a 'protected activity' under the Whistleblowers' Protection Act does not immunize him from an otherwise legitimate, or unrelated, adverse job action.").

Finally, to allow a plaintiff to shield herself under the WPA from being terminated for participating in an investigation regarding her own alleged misconduct would undermine the purpose the of the WPA. "The underlying purpose of the act is the protection of the public." *Henry*, 234 Mich App at 409. " 'The act meets this objective by protecting the whistleblowing employee and by removing barriers that may interdict employee efforts to report violations or suspected violations of law.' " *Id.*, quoting *Dolan v Continental Airlines/Continental Express*, 454 Mich 373, 378-379; 563 NW2d 23 (1997). " 'Without employees who are willing to risk adverse employment consequences as a result of whistleblowing activities, the public would remain unaware of large-scale and potentially dangerous abuses.' " *Id.*, quoting *Dolan*, 454 Mich at 379.

Therefore, we hold that because plaintiff failed to establish a prima facie case under the WPA, the trial court erred by denying defendants' motion for summary disposition as to

---

[4] Plaintiff argues that defendants never moved for summary disposition regarding this claim, and therefore, they waived it. However, defendants could not move for summary disposition on a claim that plaintiff never pleaded. Further, plaintiff never even addressed the alleged claim of retaliation for participating in the school's investigation until the hearing regarding both plaintiff and defendants' motions for summary disposition. Plaintiff's motion for summary disposition focused on retaliation for filing this lawsuit and for participating in the GenNET lawsuit.

[5] While "[t]he mere act of participating in the investigations is itself protected activity," *Truel v Dearborn*, 291 Mich App 125, 139; 804 NW2d 744 (2010), plaintiff was still required to show that her termination was because of her mere participation in the investigation.

plaintiff's Whistleblowers' claim. Accordingly, we reverse the trial court's order denying summary disposition for the Whistleblowers' claim.

## B. BREACH OF CONTRACT CLAIM

Next, defendants argue that the trial court erred by denying their motion for summary disposition as to the breach of contract claim. Again, we review de novo a trial court's decision on a motion for summary disposition. *Hoffner*, 492 Mich at 459. We also review de novo issues of contract interpretation, *Hastings Mut Ins Co v Safety King, Inc*, 286 Mich App 287, 291; 778 NW2d 275 (2009), and give the words used in the contract their plain and ordinary meanings. *Coates v Bastian Bros, Inc*, 276 Mich App 498, 503; 741 NW2d 539 (2007).

The contract at issue provides in pertinent part,

> It is further provided and agreed that the Assistant Superintendent is subject to all rules, regulations and policies set forth by the Genesee Intermediate School District and will exercise due propriety in the utilization of school district properties and equipment. The Assistant Superintendent is prohibited from engaging in conduct involving moral turpitude. The Board shall have the right to terminate the Assistant Superintendent and void this contract if the Assistant Superintendent violates the prohibition from engaging in conduct involving moral turpitude.

The parties agree that plaintiff could be terminated for conduct involving moral turpitude. However, plaintiff argues that because the term was not defined, no legal obligation was created. Plaintiff fails to recognize that although the contract does not define moral turpitude,[6] "[d]ictionary definitions may be used to ascertain the plain and ordinary meaning of terms undefined in an agreement." *Coates*, 276 Mich App at 504. Black's Law Dictionary defines "moral turpitude" as "[c]onduct that is contrary to justice, honesty, or morality. Black's Law Dictionary (8th Ed). "Morality" means "conformity to the rules of right conduct; moral or virtuous conduct." Random House Webster's College Dictionary (2001).

Additionally, the parties disagreed over whether plaintiff could be fired for reasons other than moral turpitude. Plaintiff argued that, based on the contract, she could only be fired for conduct amounting to moral turpitude and nothing else. However, because plaintiff's contract was for a definite term of employment, her employment was not at will, but rather just cause. *Rood v Gen Dynamics Corp*, 444 Mich 107, 117; 507 NW2d 591 (1993). Accordingly, plaintiff could be terminated for just cause, which includes violations of her employer's rules. See *Toussaint v Blue Cross & Blue Shield of Mich*, 408 Mich 579, 624; 292 NW2d 880 (1980). In fact, plaintiff's contract specifically provided, "It is further provided and agreed that the Assistant Superintendent is subject to all rules, regulations and policies set forth by the Genesee Intermediate School District and will exercise due propriety in the utilization of school district

---

[6] MCL 380.634(7), which requires an intermediate school board to include the moral turpitude clause in a school administrator's contract, also does not define "moral turpitude."

properties and equipment." Our Supreme Court has stated that "[b]reach of the employer's uniformly applied rules is a breach of the contract and cause for discharge." *Id.* at 624. However, "[i]n such a case, the question for the jury is whether the employer actually had a rule or policy and whether the employee was discharged for violating it." *Id.* In this case, we conclude that there is a genuine issue of material fact whether plaintiff engaged in conduct involving moral turpitude and whether plaintiff was discharged for violating uniformly applied rules.

For example, according to the Board's resolution, one reason plaintiff was terminated was for providing Svitkovich a district-paid cell phone when he was a nongovernment employee. Plaintiff testified that the GISD had done the same thing for the superintendent that left before Svitkovich. Plaintiff felt she had the authority to do so based on the "culture" of the GISD and the Board policies. Specifically, Board Policy 7450, provided that nonemployees could borrow district-owned equipment "under special circumstance if authorized by School Code or district policy." The policy further states that department directors would decide whether and to whom the equipment would be loaned based on administrative guidelines. Plaintiff, however, also acknowledged that Board Policy 7530 indicates that district-owned equipment should only be loaned under certain conditions and with the superintendent's approval, which plaintiff did not obtain. However, plaintiff believed that the Board was in the process of revising their policies, and therefore, believed that she had authority under policy 7450 to loan Svitkovich the cell phone. Further, Cindy McCain, the Assistant Superintendent of Business Services, testified that she had a conversation with plaintiff previously regarding whether Svitkovich should have a cell phone. McCain told plaintiff that he should not because he is no longer an employee. Therefore, there was a genuine issue of material fact as to defendants' policy regarding the lending of equipment to nonemployees, and whether violations of the policy provided just cause to terminate plaintiff.

The resolution also indicates that plaintiff was terminated for using taxpayer money, i.e., the district-paid cell phone, to further her extramarital affair with Svitkovich. However, there was a genuine issue of fact whether the extramarital affair was ongoing while Svitkovich had the cell phone. The audit indicates that Svitkovich had the cell phone from September 2010 to August 2011. Plaintiff claimed that the affair began over 10 years prior and only lasted one year, but she saved some romantic voicemail messages from Svitkovich, some of which were from 2007, indicating that her claim was untrue. Nevertheless, there was no indication that any of those saved messages were from the period Svitkovich had the cell phone. Further, defendants noted that they found a prescription dated July 29, 2010 for Svitkovich in plaintiff's desk for paraffin, which is used to help a male achieve an erection. Although this could certainly indicate the affair was ongoing in July 2010, the date also fell outside the timeframe Svitkovich had the cell phone. Defendants also noted that plaintiff had photos of her and Svitkovich in her desk; however, the photos show that the two had a close friendship and they are not undeniably indicative of a romantic relationship. Finally, although the audit states that the volumes of calls between plaintiff and Svitkovich on the cell phone were excessive immediately following his retirement, this in and of itself does not create an inference that the two were romantically involved at the time, and plaintiff testified that she called him to discuss GenNET and the GenNET lawsuit because he was very knowledgeable. Therefore, there is a genuine issue of material fact whether plaintiff used taxpayer money to further her extramarital affair to justify her termination for conduct involving moral turpitude.

-10-

Further, the Board terminated plaintiff for falsifying her evaluation. There was an email from Svitkovich to plaintiff in April 2011 that states, "The Evaluation is a go, put it together and I will sign and date it." Plaintiff testified that Svitkovich started the evaluation in 2010, and he never had a chance to complete it. She testified that Svitkovich dictated his portion of the evaluation, which she typed and then sent to him. Although he was no longer superintendent in April 2011, when the evaluation was drafted, plaintiff testified that the evaluation was for the 2009-2010 school year and did not have anything to do with the 2010-2011 school year, so that is why they both dated it for May 2010. Plaintiff testified that the evaluation was given to Moorman and nothing was ever said when it was submitted to him. However, Hagel testified that plaintiff was the one who sent her evaluation to Human Resources, and when Hagel discovered the email showing that plaintiff had drafted her own evaluation, she approached Moorman about it, and according to Hagel, Moorman was unsure why he received the evaluation and had planned to ask Hagel about it. Additionally, McCain testified that Svitkovich did not evaluate any other administrators after he left. Given plaintiff's testimony, however, there is a genuine issue of material fact whether the evaluation truly provided just cause for termination provided that Svitkovich dictated the evaluation and it only affected the school year in which he was superintendent.

Another reason supporting plaintiff's termination was her act of revealing confidential communications. Board Policy 8350 prohibits the divulging of confidential information of the Board, "except to other employees who may need such information in connection with their duties and to authorized parties in accordance with proper departmental procedures." Plaintiff admitted to forwarding communication from attorneys representing the GISD in the GenNET lawsuit, and was aware of policy 3210. However, she testified that the communication was not marked confidential and did not indicate that it should not be forwarded. Given that it was electronic communication, she "did not feel that [she] was abusing any confidential legal information." Plaintiff testified that in her professional opinion she felt it was appropriate to inquire with Svitkovich because he was superintendent emeritus and had the knowledge base that would help the GISD and GenNET. Further, McCain was asked whether she had an opinion on whether it was proper for plaintiff to forward attorney-client information, McCain testified that "we've been instructed by the Superintendent Tom Svitkovich that we couldn't forward information outside of the organization from legal counsel." However, contrary to what defendants argued, this does not indicate that this instruction was provided to plaintiff. Finally, Hagel testified that the Board documents plaintiff forwarded were not confidential. She testified that they were summaries and updates of programs and initiatives the Board was working on. Hagel did not see this as a breach of confidentiality, just a breach of mutual trust to keep Board information private. Therefore, there is a genuine issue of material fact whether this amounted to moral turpitude or provided just cause to terminate plaintiff.

The Board also terminated plaintiff based on the audit's revelation of numerous discrepancies in plaintiff's travel expenses. The audit stated that there were many times that the attendance system indicated that plaintiff was at work, but she remitted expenses for conference reimbursement for those same days. There were also instances where plaintiff would arrive at the conferences early or stay late and would submit for reimbursement. Larry Ford, a 40-year Board member, testified that it was common for Board members to arrive at the conference a day early, and if the conference ran late in the day, they would stay a day later and fly home the next day. This was reimbursed by the GISD. Ford testified that Board members sometimes would

-11-

skip the conferences and go golfing, himself included. Ford testified that the Board would have approved plaintiff's conferences because it was required to approve all travel, but it was the business office's job to examine the expenses submitted for reimbursement. Plaintiff also testified that if there were ever a problem with her expenses, the business office would have "kicked them back," so if she was reimbursed, she assumed there was not a problem and that they were authorized. McCain, however, who ran the business office, testified that if the travel was approved by the superintendent she "was directed to not be a blocker and process the payment." Further, plaintiff was able to provide explanations for some of the travel discrepancies. Plaintiff also testified that some of the travel that was shown as conferences was actually visitations that she did to school districts in other states. Therefore, there is a question of fact whether plaintiff's travel was properly approved and reimbursed.

Finally, there was also an issue as to whether the policies in question were uniformly applied, which as noted in *Toussaint*, 408 Mich at 624, is a requirement when terminating a just cause employee for violating employer policies. For example, Ford testified at his deposition that he was on the Board for 40 years and to his knowledge, no one had been fired for having an extramarital affair. There was an indication that a former Board member divorced his wife to marry the woman that he had an extramarital affair with, who was also a GISD employee, and neither one of them was fired. Additionally, there were claims that plaintiff was using the GISD's equipment, such as cell phone and computers, for her personal use, but there was evidence that other GISD employees did this as well.

Therefore, when viewing the evidence in a light most favorable to plaintiff, there was a genuine issue of material fact whether plaintiff engaged in conduct involving moral turpitude and whether plaintiff was discharged for violating uniformly applied rules as to warrant her termination. Accordingly, we affirm the trial court's denial of defendants' motion for summary disposition in this regard.

## III. MOTION FOR NEW TRIAL

Next, defendants argue that the trial court erred by denying its motion for a new trial for several reasons. We review for an abuse of discretion a trial court's decision to deny a motion for a new trial. *Shuler v Mich Physicians Mut Liability Co*, 260 Mich App 492, 509; 679 NW2d 106 (2004).

## A. COUNSEL MISCONDUCT

First, defendants argue that they should be granted a new trial because the trial court allowed evidence of lack of prosecution. Although defendants attempt to frame their argument as one involving admittance of evidence,[7] defendants actually argue that plaintiff's counsel

---

[7] To the extent defendants argue that the trial court erred by admitting evidence of lack of prosecution, we deem this issue waived because defendants did not identify specific evidence it was challenging. Defendants may not assert an error and leave it to this Court to discover the basis for the claim. *Wysocki v Kivi*, 248 Mich App 346, 360; 639 NW2d 572 (2001). However,

committed misconduct by repeatedly telling the jury during closing argument that the prosecutor determined that plaintiff did not commit a crime, and as such, was wrongfully terminated. Defendants argue that these remarks were highly prejudicial and denied defendants a fair trial.

Initially, we reject plaintiff's argument that this issue was not properly preserved. Our Supreme Court has stated,

> When reviewing an appeal asserting improper conduct of an attorney, the appellate court should first determine whether or not the claimed error was in fact error and, if so, whether it was harmless. If the claimed error was not harmless, the court must then ask if the error was properly preserved by objection and request for instruction or motion for mistrial. If the error is so preserved, then there is a right to appellate review; if not, the court must still make one further inquiry. It must decide whether a new trial should nevertheless be ordered because what occurred may have caused the result or played too large a part and may have denied a party a fair trial. If the court cannot say that the result was not affected, then a new trial may be granted. Tainted verdicts need not be allowed to stand simply because a lawyer or judge or both failed to protect the interests of the prejudiced party by timely action. [*Reetz v Kinsman Marine Transit*, 416 Mich 97, 102-103; 330 NW2d 638 (1982).]

The claims of misconduct occurred during closing argument and rebuttal. Defense counsel objected to the last set of statements made during rebuttal. Specifically, the following exchange occurred:

> He says maybe she stole, 76—76,000. Maybe she stole 50,000. Maybe she stole 40,000. He just said that. Well, maybe she stole zero. Zero. And in fact the prosecuting attorney says it is zero. She didn't steal anything. If she would have stole (sic) something it's my job as prosecuting attorney—
>
> [*Defense Counsel*]: I'm gonna object, your Honor.
>
> [*Plaintiff's Counsel*]: Huh?
>
> [*Defense Counsel*]: These statements were not made from the prosecuting attorney. The fact that the prosecuting attorney didn't take any action is—
>
> *The Court*: He didn't say that. I—
>
> [*Plaintiff's Counsel*]: Well—but he didn't prosecute.
>
> *The Court*: That's right.

we take this opportunity to caution the trial court on remand for a new trial that "evidence of acquittal or lack of prosecution is highly prejudicial because it goes to the principal issue before the jury," and because of the different burdens of proof, there is little or no probative value. *Cook v Auto Club Ins Assoc (On Remand)*, 217 Mich App 414, 417; 552 NW2d 661 (1996).

> [*Plaintiff's Counsel*]: I mean—
>
> *The Court*: But there's a big difference.
>
> [*Plaintiff's Counsel*]: He said—as Mr. Mullins had said maybe it was 76 grand, maybe it was 50 grand, maybe it was 40,000. And the prosecuting attorney looked at this and said there's no crime. There's no prosecution, period. End of story.

Although the trial court did not make a definitive ruling, it is clear that the objection was overruled based on the fact that plaintiff's counsel continued on with his argument without interjection by the trial court.[8] Accordingly, defendants properly preserved this issue.[9]

With regard to the claims of misconduct, the first set of statements that were made during closing argument is as follows:

> Two prosecuting attorneys; the first one said I know the people involved in this. Dave Leyton and John Potbury said we're not gonna handle this. We're going to avoid the appearance of conflict. So they shipped it over to Lapeer. Byron Konschuh—I don't know Byron Konschuh. He was a prosecuting attorney. Now he's a judge like Judge Fullerton over there in Lapeer. That's who Brian—Byron Konschuh is. He looks at this—he hears the story. Same story she [sic] that she told you on direct. He rejected her story and he rejects her book.[10] Oh, is she angry. Oh, is defendant Hagel angry. She issues a press release, you know. Well, I'm disappointed. I'm disappointed that you rejected my book. Byron Konschuh's got some life learning. He's no fool. You know, he looked at the book and sees she created it. She created this book. She's not a CPA.
>
> * * *
>
> What's the total amount of non-economic loss; emotional distress, mental anguish? Her reputation's destroyed. I mean, she's branded a thief and—she's not branded an adulterer. She's branded a thief and embezzler. These are felony crimes. People do ten years. You know, there's one guy in our county whose job—and every county's got a prosecuting attorney. He's got one job; to prosecute crime. And $87,000.00 stolen is a crime. It's a crime in Genesee

---

[8] Although *Reetz* states that counsel must also request an instruction, in this instance, such a request was futile given that the trial court overruled the objection.

[9] Additionally, we note that defendants also moved for a new trial based on the misconduct of plaintiff's counsel during closing argument. Accordingly, this issue was raised before, and addressed by, the trial court, and therefore properly preserved. *Polkton Charter Twp v Pellegrom*, 265 Mich App 88, 95; 693 NW2d 170 (2005).

[10] "Book" refers to the Plante Moran audit.

County.  It's a crime in Lapeer County.  If it had really happened she'd have been prosecuted.  And yet, she's not prosecuted.  He looks at the book and he says there's no crime her[e].  There's no crime.

The second set of statements made during rebuttal includes:

> And you know, incidentally, that book festooned with crimes and such, why is it the prosecuting attorney didn't prosecute?  He looked at that book.  He says, there's no crime here.  There's not even one crime here.  There's one guy in every count[y] whose job is to prosecute crime.  That's the prosecuting attorney.  That's his only job.  He doesn't do divorces too.  He doesn't do civil cases like this.  He doesn't do deeds and land contracts.  He's got one goal in life and that's to prosecute crimes.

> And Byron Konschuch, the prosecutor, listened to their story, looked at their book and said there's no crime here.  Not even one crime I can prosecute.

> * * *

> He says maybe she stole, 76—76,000.  Maybe she stole 50,000.  Maybe she stole 40,000.  He just said that.  Well, maybe she stole zero.  Zero.  And in fact the prosecuting attorney says it is zero.  She didn't steal anything.  If she would have stole (sic) something it's my job as prosecuting attorney—

We find that these arguments are improper.  In the insurance realm, this Court has held that evidence of "lack of prosecution is not admissible in an insured's suit against the insurer." *Cook (On Remand)*, 217 Mich App at 417.  The reason being that "evidence of acquittal or lack of prosecution is highly prejudicial because it goes to the principal issue before the jury," and because of the different burdens of proof, there is little or no probative value.  *Id.* at 418. Likewise, under these circumstances, it was improper for counsel to state that the prosecutor determined that there was no crime.  Stating that there is no crime is different from stating that the prosecution decided not to prosecute.  There could still be a crime even though a prosecutor decides not to prosecute, particularly because of the different burdens of proof.  In fact, this Court has stated that "a prosecutor's decision to *nolle prose* may take into account many factors irrelevant in a civil suit." *Id.* (quotation marks and citation omitted).

Contrary to plaintiff's argument, counsel was not arguing facts in evidence.  Plaintiff argues that the press release issued by the GISD that was admitted at trial without objection showed that the prosecutor determined that there was no crime.  Plaintiff specifically pointed to Hagel's statement in the press release, in which she stated, "I would like to express my concern and displeasure over the failure to find criminal fault . . . While the prosecutor may not have felt this could have been proven beyond a reasonable doubt, that doesn't excuse the behavior of these two people."  This statement, however, does not state that the prosecutor himself stated that there was no crime, as counsel argued during closing argument.  Rather, it is Hagel's interpretation of the prosecutor's decision not to pursue criminal charges.  Because the prosecutor did not testify in this case, it was improper for counsel to argue that the prosecutor concluded that plaintiff did not commit a crime.

-15-

We must next determine whether these improper arguments warrant reversal. An attorney's misconduct at trial may necessitate a new trial when the misconduct "prejudice[s] the jury and divert[s] the jurors' attention from the merits of the case." *Kern v St Luke's Hosp*, 404 Mich 339, 354; 273 NW2d 75 (1978). Our Supreme Court has stated,

> " 'Counsel may, acting on their own judgment as to propriety and good taste, discuss the character of witnesses, the probability of the truth of testimony given on the stand, and may, *when there is any reasonable basis for it,* characterize testimony.' [Citation omitted.]

> "But where language is such as evinces a *studied purpose to inflame or prejudice the jury, based upon facts not in the case,* this Court has not hesitated to reverse." 371 Mich 75, 78-79. (Emphasis added.) [*Kern*, 404 Mich at 353-354.]

See also *Knight v Gulf & Western Props, Inc*, 196 Mich App 119, 132-133; 492 NW2d 761 (1992); *Wilson v Gen Motors Corp*, 183 Mich App 21, 26; 454 NW2d 405 (1990) ("A lawyer's comments usually will not be cause for reversal unless they indicate a deliberate course of conduct aimed at preventing a fair and impartial trial[,]" or "where counsel's remarks were such as to deflect the jury's attention from the issues involved and had a controlling influence upon the verdict."). Further, an appellant is not required to " 'demonstrate affirmatively' a prejudicial effect on the jury resulting from improper remarks of opposing counsel." *Wayne Co Bd of Rd Comm'rs v GLS LeasCo*, 394 Mich 126, 139; 229 NW2d 797 (1975). If the appellate court cannot say that the jury was not diverted from the merits of the case or that the "mischief done" was cured by the trial court's efforts, then a new trial is required. *Id.*

We find that counsel's improper arguments warrant reversal. As discussed, counsel's arguments were not based on facts in the case. The effect of counsel's arguments was to convey to the jury that because the prosecutor determined that plaintiff did not commit a crime, the allegations leading to plaintiff's termination had to be unsubstantiated. This was repeated to good effect throughout closing argument. We believe that counsel's persistence in stating that the prosecutor determined that plaintiff did not commit a crime shows a deliberate course of conduct aimed at preventing a fair trial and was such as to deflect the jury's attention from the issues involved in this case. As stated in *Reetz*, "when, as in this case, the theme is constantly repeated so that the error becomes indelibly impressed on the juror's consciousness, the error becomes incurable and requires reversal." *Reetz*, 416 Mich at 111.

Additionally, we note that although the trial court provided a limiting instruction at the close of trial, it was insufficient to cure the prejudicial effect of counsel's arguments. The trial court instructed the jury as follows:

> Members of the jury, you have heard testimony that the plaintiff was not prosecuted criminally. In a criminal case the burden of proof is beyond a reasonable doubt. In a civil case, however, the burden of proof is by a preponderance of the evidence. Beyond a reasonable doubt is a higher standard, higher burden than is preponderance of the evidence.

This instruction, however, only explained the different burdens of proof and did not provide any context. At the very least, the trial court should have instructed the jury that simply because the prosecutor chose not to prosecute plaintiff, does not mean that a crime had not been committed. Therefore, we conclude defendants are entitled to a new trial for the breach of contract claim.

Defendants also challenged counsel's statement made during closing argument that "Well, Lisa Hagel's not a lawyer. There is a lawyer up here with a robe. Judge Fullerton and she says yes, it is a whistleblower case. It's a type two participating in court action. And she's going to read you an instruction that says just that; just what I've just told you."

When read in context, it appears that counsel was actually trying to explain to the jury that defendants mistakenly classified the action as a type-one-whistleblower claim, when plaintiff was alleging that she was a type two whistleblower. However, counsel took the argument a step too far by telling the jury that the judge herself said that "yes, it is a whistleblower case. It's a type two participating in court action." It could easily be inferred from that statement that the trial court determined that plaintiff had a valid claim and the jury should render a verdict in her favor. This is improper, as "the jury is the sole judge of the facts" and "[i]t is the function of the jury alone to listen to testimony, weigh the evidence and decide the questions of fact." *People v Palmer*, 392 Mich 370, 375; 220 NW2d 393 (1974). This statement, in essence, eliminated the jury's role to be the sole judge of whether plaintiff had a valid whistleblower claim.

However, because defendants did not object to this statement at trial, we must decide whether a new trial is warranted "because what occurred may have caused the result or played too large a part and may have denied a party a fair trial." *Reetz*, 416 Mich at 103. Because we cannot say with confidence that this statement did not affect the verdict, especially when coupled with the improper arguments discussed earlier, we find that this error also warrants a new trial. See *Reetz*, 416 Mich at 103 ("If the court cannot say that the result was not affected, then a new trial may be granted.").

Next, defendants argue that plaintiff's counsel improperly asked the jury to place themselves in plaintiff's position when he stated the following:

> What we're saying is that she participated in that GenNET lawsuit and she got retaliated for it. Okay? That's why she got terminated and fired. And it's just like if a juror, you know, had an employer and the employer said I told you I didn't want you to go to jury—I told you I didn't want you to do that service. We needed you here. You're fired. That would be a type two whistleblower. That juror would be a type two whistleblower and it would be unlawful for the employer to do that. It would be unlawful for someone not to do business with you, okay, because you served on a jury. You'd be a type two whistleblower like her. Okay? And you would be entitled to—to file a claim for all the losses you suffered. It's unlawful to retaliate against you because you sat as jurors or she participated in a court action.

While appeals to the jury to sympathize with the plaintiff are improper, see *People v Watson*, 245 Mich App 572, 591; 629 NW2d 411 (2001), when viewed in context, counsel did

-17-

not appeal to the jury's sympathy by asking them to place themselves in plaintiff's position. Rather, counsel was using the jury as an example to illustrate what a type two whistleblower is. Accordingly, we find that counsel's argument was not improper in this regard.

Finally, defendants argue that they are entitled to a new trial because counsel referred to other Board members as "drunken sailors."[11] Defendants argue that plaintiff's counsel used this reference "dozens of times," but the transcript citations provided by defendants are inaccurate and only point to one reference. Specifically, plaintiff's counsel was questioning McCain about whether it was true that Clio Schools alleged in the GenNET lawsuit that GISD and GenNET were spending money "like drunken sailors." Defendants objected to the characterization, noting that the characterization was not in the complaint, and plaintiff's counsel agreed to rephrase it. The objection was sufficient to cure the error in this regard, particularly where it was clear this was simply counsel's characterization, and the jury was instructed that the attorneys' statements and questions were not evidence. See *Guerrero v Smith*, 280 Mich App 647, 658-659; 761 NW2d 723 (2008) (noting that objections and instructions may be sufficient to cure any prejudice arising from the remarks of counsel).

## B. EVIDENCE OF SETTLEMENT NEGOTIATIONS

Next, defendants argue that they are entitled to a new trial because the trial court erred by allowing evidence of the resignation offer defendants provided to plaintiff before they sought her termination. Defendants filed a motion in limine to exclude evidence of the offer, which the trial court denied. We review for an abuse of discretion a trial court's decision to deny a motion in limine. *Elezovic v Ford Motor Co*, 472 Mich 408, 431; 697 NW2d 851 (2005).

The resignation offer was given to plaintiff at the November 2011 meeting with Hagel in an effort to encourage plaintiff to resign quietly. Hagel testified that it was only a draft. The offer provided that as part of plaintiff's resignation she would pay restitution to the GISD of $480 for misusing district telephone equipment. At the motion hearing to exclude the offer, plaintiff argued that the offer showed pretext, and was therefore allowed under MRE 408. Specifically, plaintiff argued that it proved Hagel's motive and intent because Hagel fired plaintiff, who was "a million dollar producer," over $480 worth of cell phone charges. The trial court agreed, and denied defendants' motion.

At trial, plaintiff's counsel argued that the only grounds Hagel had to terminate plaintiff at the November 2011 meeting was the fact that she misused district telephone equipment worth $480, as evidenced by the resignation offer. Plaintiff's counsel argued that because this was the only reason the GISD had to fire plaintiff, and plaintiff refused to accept the resignation offer based on that reason alone, Hagel had Plante Moran create the "phony" audit to terminate plaintiff to avoid her giving testimony in the GenNET lawsuit. On appeal, defendants argue that

---

[11] Defendants attempt to assert this argument as an evidentiary issue, in that they cite this argument in support of their assertion that the trial court erred by allowing plaintiff to compare herself to other Board members who were not similarly situated. In context, however, this argument is actually a claim of counsel misconduct and will be addressed as such.

the offer was merely a draft, and the $480 figure was an initial figure known at the time of the preliminary investigation when the offer was drafted, and in actuality, further investigation revealed that the cell phone given to the nonemployee cost the GISD more than $480. Defendants argue that MRE 408 excludes evidence of the resignation offer.

MRE 408 provides,

> Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount.

The rule "does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution." MRE 408. Plaintiff argues that MRE 408 does not require exclusion because the offer was used to show pretext, a purpose permitted by the rule. However, plaintiff used the resignation offer to prove that defendants did not have a legitimate business reason to terminate plaintiff, which directly relates to the validity of both the Whistleblowers' and breach of contract claims. MRE 408 is specifically designed to exclude attempts to compromise that are used to prove liability for or invalidity of a claim. Therefore, the trial court abused its discretion by admitting evidence of the resignation offer.

We further find that the error affected defendants' substantial rights and was therefore not harmless. MRE 103. The purpose behind MRE 408 is to encourage compromise and settlement of disputes between parties. *Chouman v Home Owners Ins Co*, 293 Mich App 434, 438; 810 NW2d 88 (2011). The rule requires exclusion of evidence of compromise particularly because "settlements may be motivated by a great many possible considerations unrelated to the substantive merits of a claim." *Id.* In this case, plaintiff used the resignation offer to continually argue that the only reason defendants fired plaintiff was for misusing telephone equipment worth $480, which directly related to the substantive merits of her claim. However, as Hagel testified, the $480 was not a reason for termination, the GISD was simply asking for restitution to make it whole again. At the time the resignation offer was presented, plaintiff was not being terminated, she was merely asked to resign because she provided a government-paid cell phone to a nongovernment employee, which was against district policy. Nevertheless, plaintiff repeatedly used the inadmissible evidence to argue that the resignation offer was proof that the only reason defendants had to terminate plaintiff was for misusing district telephone equipment worth $480 and all other reasons provided for terminating plaintiff were concocted. This was highly prejudicial to defendants and warrants a new trial.

## C. IRRELEVANT AND PREJUDICIAL EVIDENCE

Defendants also argue that they are entitled to a new trial because the trial court erred by allowing plaintiff to reference two former employees that had an affair and by allowing plaintiff to accuse the Board of spending money on porn, which was irrelevant and prejudicial evidence. However, defendants do not support this argument with citations to the record. Defendants did cite one page of the record relating to the porn accusation, but it is inaccurate. Defendants may

not assert an error and leave it to this Court to discover the basis for the claims. *Wysocki*, 248 Mich App at 360.

## IV. OTHER CLAIMS OF ERROR

Finally, defendants also challenge the trial court's denial of their motion for a JNOV regarding the Whistleblowers' claim, and its denial of their request for a remittitur. Given our resolution of the issues earlier, these issues are moot and we decline to address them.

## V. CONCLUSION

For the reasons discussed, we reverse the trial court's denial of summary disposition for the Whistleblowers' claim, and we reverse and remand to the trial court for a new trial for the breach of contract claim. Defendants, being the prevailing party, may tax costs pursuant to MCR 7.219. We do not retain jurisdiction.

/s/ Christopher M. Murray
/s/ Patrick M. Meter
/s/ Donald S. Owens