# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

TY-RON STEVEN ANDERSON,

        Defendant-Appellant.

UNPUBLISHED
November 10, 2016

No. 327732
Wayne Circuit Court
LC No. 14-010853-FC

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

CALVIN REMON MOSBY,

        Defendant-Appellant.

No. 328134
Wayne Circuit Court
LC No. 14-007725-FC

Before: TALBOT, C.J., and K. F. KELLY and MURRAY, JJ.

PER CURIAM.

In Docket 327732, Ty-Ron Steven Anderson (Anderson) appeals as of right his jury trial convictions for first-degree premeditated murder, MCL 750.316(1)(a); felon in possession of a firearm, MCL 750.224f; and possession of a firearm during the commission of a felony (second offense), MCL 750.227b(2). Anderson was sentenced to life in prison without parole for the murder conviction, one to five years' imprisonment for the felon-in-possession conviction, and five years' imprisonment for the felony-firearm conviction.

In Docket 328134, Calvin Remon Mosby (Mosby) appeals as of right his jury trial convictions for first-degree premeditated murder; two counts of assault with intent to murder (AWIM), MCL 750.83; felon-in-possession, and felony-firearm. Mosby was sentenced to life in prison without parole for the murder conviction, 25 to 30 years' imprisonment for each of the AWIM convictions, one to five years' imprisonment for the felon-in-possession conviction, and two years' imprisonment for the felony-firearm conviction.

-1-

Finding no errors warranting reversal, we affirm both defendants' convictions and sentences.

## I. BASIC FACTS

This appeal involves the murder of eight-year-old Jakari Pearson, who lived at 682 East in an area known as the Brewster Projects. The prosecution's theory of the case was that Mosby became enraged after his ex-girlfriend, Samona Cochran, accused Mosby of breaking into her home. Mosby, accompanied by 16-year-old Devontae Starks, used a SKS rifle he received from Anderson to shoot at Cochran's home, killing Jakari as he slept in his bed in the early morning hours of July 30, 2014. The defendants were tried together before separate juries.

Cochran testified that she stopped seeing Mosby in April 2014, three months before the shooting. At that time, Mosby told Cochran that if he "couldn't have me, nobody would." He had threatened to break out her windows and kill the people around her, causing her to file a police report. Cochran returned home from breakfast on July 29, 2014 to find that her home had been broken into. She called the police, who located her property under a nearby tree. When officers first arrived, Cochran did not name Mosby as a possible suspect. But Mosby called her, accusing her of telling the officers that he was responsible. While Cochran had not mentioned Mosby's name to police, she had discussed him as a possible suspect with her neighbors. After arguing with Mosby, Cochran went back out to where the officers were and specifically mentioned Mosby. Mosby left voicemails for Cochran that day. In one, he threatened to "blow your f*****' brains."

Starks testified for the prosecution as part of a plea deal. He testified that Mosby was a neighborhood tattoo artist. The two of them had a "joint venture" whereby Starks would sell marijuana to Mosby's customers. Starks testified that he and a friend were responsible for breaking into Cochran's home. Starks's friend believed that Cochran had stolen some marijuana from him. The two men stole various items and left them under a nearby tree. Starks ran into Mosby shortly after the robbery and heard Mosby angrily say that Cochran had accused him of the theft. Mosby threatened to kill Cochran. Two neighbors testified that Mosby said that he would kill Cochran and her son because she was accusing Mosby of breaking into her home. Starks did not tell Mosby that he was the person who broke into Cochran's home because he was afraid that Mosby would kill him.

Early in the afternoon of July 29, 2014, Starks and Mosby left the neighborhood so that Mosby could tattoo Starks's girlfriend's sister. Throughout the afternoon, Mosby remained angry. When Mosby and Starks returned to the neighborhood that evening, Mosby told Starks that the shooting of the house was about to go down. Anderson arrived in a black Jeep with a passenger. Anderson gave Mosby a dark hoodie and a semi-automatic rifle and agreed to meet Mosby and Starks after the shooting. Mosby and Starks went to the rear of Cochran's home where Jakari slept. Mosby aimed the gun at the building and Starks ran. Starks heard multiple gunshots.

After the shooting, Starks and Mosby ran to their prearranged location, where Anderson was waiting in his Jeep. Eventually, Anderson dropped off Mosby and Starks. Starks gave the gun to Anderson's passenger before he left. Mosby and Starks went to Starks's girlfriend's

house, where Mosby threatened to kill Starks if he told anyone. Starks gave Mosby money for a bus ticket and a different shirt. Mosby and Starks later were arrested.

Police executed a search warrant at Anderson's house and found the SKS rifle that had been used to kill Jakari along with a magazine and bullets. Police technicians determined that Anderson was the seventh most frequent contact on Mosby's cell phone. On the morning after the shooting, Mosby sent a text to Anderson, "News report 8-year-old boy shot."

During his jail calls, Anderson indicated that "the juv" presumably Starks, would be testifying and said "one of them niggas is telling." At trial, the officer in charge testified that Starks' mother had been moved, as she had received threats from the person who had been the passenger in defendant's Jeep.

## II. SUFFICIENCY OF THE EVIDENCE

Both defendants argue that the evidence was insufficient to support their convictions. "This Court reviews de novo defendant's challenge to the sufficiency of the evidence. We view the evidence in the light most favorable to the prosecution to determine whether a rational trier of fact could have found the essential elements of the crime to have been proved beyond a reasonable doubt." *People v Meissner*, 294 Mich App 438, 452; 812 NW2d 37 (2011).

## A. ANDERSON

On appeal, Anderson concedes that there was sufficient evidence to support his felon-in-possession and felony-firearm charges. He challenges only his murder conviction.

"The elements of first-degree murder are (1) the intentional killing of a human (2) with premeditation and deliberation." *People v Bennett*, 290 Mich App 465, 472; 802 NW2d 627 (2010).

The aiding and abetting statute, MCL 767.39, provides that a defendant may be convicted if he aided or abetted in the commission of a charged crime. The statute reads:

> Every person concerned in the commission of an offense, whether he directly commits the act constituting the offense or procures, counsels, aids, or abets in its commission may hereafter be prosecuted, indicted, tried and on conviction shall be punished as if he had directly committed such offense.

Therefore, in order to be convicted under an aiding and abetting theory, the prosecution must prove:

> (1) the crime charged was committed by the defendant or some other person; (2) the defendant performed acts or gave encouragement that assisted the commission of the crime; and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time that [the defendant] gave aid and encouragement. [*People v Robinson*, 475 Mich 1, 6; 715 NW2d 44 (2006).]

"The phrase 'aids or abets' is used to describe any type of assistance given to the perpetrator of a crime by words or deeds that are intended to encourage, support, or incite the commission of that crime." *People v Moore*, 470 Mich 56, 63; 679 NW2d 41 (2004). "In determining whether a defendant assisted in the commission of the crime, the amount of advice, aid, or encouragement is not material if it had the effect of inducing the commission of the crime." *Id.* at 71. Whether and to what extent a defendant acts or gives encouragement "must be determined on a case-by-case basis." *Id.*

Anderson concedes that the evidence was sufficient to convict Mosby as the principle, but that the evidence was insufficient that Anderson shared Mosby's intent to kill.

In *Robinson*, the defendant agreed with his codefendant that they would go to the victim's house and "f*** him up." The defendant drove to the victim's home and provided the first blows to the victim. Once the victim was on the ground, the codefendant began to kick the victim. The defendant told his codefendant "that was enough" and walked back to the car. The defendant heard a single gunshot; the codefendant had shot the victim. The trial court found the defendant guilty of second-degree murder, but this Court reversed, finding that there was insufficient evidence to support the defendant's conviction because there was no evidence establishing that the defendant was aware of his codefendant's intent to kill the victim. *Id.* at 4-5. Our Supreme Court reversed, holding that the natural and probable consequence of aggravated assault was death. While the defendant may have only intended to assault the victim, it was foreseeable that a plan to assault someone could "escalate the assault to murder" and the fact that defendant "serendipitously left the scene of the crime moments before [the] murder does not under these circumstances exonerate him from responsibility for the crime." *Id.* at 11-12. The Court explained that "sharing the same intent as the principal allows for accomplice liability. However, sharing the identical intent is not a *prerequisite* to the imposition of accomplice liability." *Id.* at 14. The Court held:

> [A] defendant must possess the criminal intent to aid, abet, procure, or counsel the commission of an offense. A defendant is criminally liable for the offenses the defendant specifically intends to aid or abet, or has knowledge of, as well as those crimes that are the natural and probable consequences of the offense he intends to aid or abet. Therefore, the prosecutor must prove beyond a reasonable doubt that the defendant aided or abetted the commission of an offense and that the defendant intended to aid the charged offense, knew the principal intended to commit the charged offense, or, alternatively, that the charged offense was a natural and probable consequence of the commission of the intended offense. [*Id.* at 15.]

The prosecution presented sufficient evidence to convict Anderson of first-degree murder. Anderson provided Mosby with the murder weapon and also provided transportation after the shooting. A reasonable jury could conclude that Anderson disregarded the likelihood that the natural tendency of his acts was to cause death. Clearly Anderson performed acts or gave encouragement that assisted Mosby in Jakari's murder.

B. MOSBY

Mosby was convicted of first-degree murder, AWIM, felon-in-possession, and felony-firearm. As previously stated, "[t]he elements of first-degree murder are (1) the intentional killing of a human (2) with premeditation and deliberation." *Bennett*, 290 Mich App at 472. "The elements of assault with intent to commit murder are (1) an assault, (2) with an actual intent to kill, (3) which, if successful, would make the killing murder." *People v McRunels*, 237 Mich App 168, 181; 603 NW2d 95 (1999). A felon-in-possession charge requires that the prosecution prove: (1) the defendant possessed a firearm, (2) the defendant was previously convicted of a specified felony, and (3) fewer than five years had elapsed since he or she paid all fines, served all terms of imprisonment, and completed all terms of probation or parole imposed for the offense. MCL 750.224f(2)(a). Finally, the elements of felony-firearm are that the defendant possessed a firearm during the commission of or the attempt to commit a felony. MCL 750.227b(1). "[T]he elements of an offense may be established on the basis of circumstantial evidence and reasonable inferences from the evidence." *People v Dunigan*, 299 Mich App 579, 582; 831 NW2d 243 (2013).

On appeal, Mosby argues that the evidence was insufficient to prove that he was the shooter. "[I]dentity is an element of every offense." *People v Yost*, 278 Mich App 341, 356; 749 NW2d 753 (2008). Mosby's primary allegation on appeal is that Starks's testimony was not credible and that it contradicted other witnesses and other evidence. However, our Supreme Court has admonished:

> Of course, appellate courts are not juries, and even when reviewing the sufficiency of the evidence they must not interfere with the jury's role:
>
> > "[An appellate court] must remember that the jury is the sole judge of the facts. It is the function of the jury alone to listen to testimony, weigh the evidence and decide the questions of fact.... Juries, not appellate courts, see and hear witnesses and are in a much better position to decide the weight and credibility to be given to their testimony."
>
> [*People v Wolfe*, 440 Mich 508, 514–15; 489 NW2d 748, amended 441 Mich 1201 (1992), quoting *People v Palmer*, 392 Mich 370, 375–376, 220 NW2d 393 (1974).]

As such, an appellate court "will not interfere with the trier of fact's role of determining the weight of the evidence or the credibility of witnesses." *People v Eisen*, 296 Mich App 326, 331; 820 NW2d 229 (2012), quoting *People v Kanaan*, 278 Mich App 594, 619; 751 NW2d 57 (2008). Likewise, "[i]t is for the trier of fact, not the appellate court, to determine what inferences may be fairly drawn from the evidence and to determine the weight to be accorded those inferences." *People v Hardiman*, 466 Mich 417, 428; 646 NW2d 158 (2002).

There was sufficient evidence that Mosby was the shooter. Numerous witnesses testified that Mosby was upset with Cochran, thinking that she had given his name to police as a possible suspect for the break-in. He verbalized his intent to kill Cochran and anyone else in her home. Mosby's cellular records put him in the area of the shooting and in contact with Anderson, who provided the gun and transportation. Although no one actually *saw* Mosby shoot the weapon at

Cochran's house, the circumstantial evidence and inferences therefrom were sufficient to prove Mosby's guilt.

## III. PROSECUTORIAL ERROR

Both defendants argue that the prosecutor erred in a variety of ways. Neither defendant objected to these alleged errors. As such, our review "is limited to ascertaining whether plain error affected defendant's substantial rights. *People v Brown*, 279 Mich App 116, 134; 755 NW2d 664 (2008). "Reversal is warranted only when plain error resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity, or public reputation of judicial proceedings." *People v Unger*, 278 Mich App 210, 235; 749 NW2d 272 (2008).

"Given that a prosecutor's role and responsibility is to seek justice and not merely convict, the test for prosecutorial misconduct is whether a defendant was denied a fair and impartial trial." *People v Dobek*, 274 Mich App 58, 63; 732 NW2d 546 (2007). "Issues of prosecutorial misconduct are decided case by case, and this Court must examine the entire record and evaluate a prosecutor's remarks in context" to determine the propriety of a prosecutor's remarks in the context of the facts of the case and in relation to the defendant's arguments. *Id.*

### A. ANDERSON

### 1. MISSTATEMENT OF LAW

Anderson first argues that the prosecutor misstated the law when discussing Anderson's knowledge and intent. "A prosecutor's clear misstatement of the law that remains uncorrected may deprive a defendant of a fair trial. However, if the jury is correctly instructed on the law, an erroneous legal argument made by the prosecutor can potentially be cured." *People v Grayer*, 252 Mich App 349, 357; 651 NW2d 818 (2002) (internal citation omitted).

During closing arguments, the prosecutor argued:

> Now, Mr. Anderson. Mr. Anderson's jury you're gonna get an instruction on aiding and abetting. Did Anderson assist Mr. Mosby in any way? You need to think about whether or not what Mr. Mosby did was first-degree murder or second-degree murder, because whatever Mr. Mosby did, is what Mr. Anderson did, if he helped Mr. Mosby do it, okay.

> Now, this case I want you to look at this aiding and abetting instruction. Okay. Anyone who intentionally assists someone else who [sic] committing a crime is guilty as the person who directly commits it, and can be convicted of the crime as an aider and abetter. To prove this charge, we have to prove the following beyond a reasonable doubt.

> First, that the alleged crime was actually committed, either by the defendant or someone else. It doesn't matter whether anyone else has been convicted of that crime. Second, that before or during the crime the defendant did something to assist in the commission of the crime. Okay, we have before and during in this case. We have Mr. Anderson speaking with Mr. Mosby as of noon

-6-

that day, remember that text? That text ["]we got problems["] that Mr. Mosby sends to Mr. Anderson.

This is around the same time that Mr. Mosby is walking around the neighborhood threatening to kill Samona and everybody else, threatening to kill Samona, threatening to kill Samona and her son. They continue to stay in contact and it's not until Mr. Anderson gets off work that he goes all the way back to his house in Warren and directly back down with the gun in this case, okay. So when we're talking about assisting, we're talking about providing the SKS assault rifle, providing that piece of clothing to cover up it [sic], and providing him with a ride.

Third, that the time the defendant must have intended the commission of the crime alleged, or must have known that the other person intended its commission, or that the crime alleged was a natural and probable consequence of the commission of the crime intended.

What does this mean? For the Anderson jury, whatever Mr. Mosby does in for a penny, in for a pound, Mr. Anderson is guilty of it. If Mr. Anderson, if you want to give him all the benefit of the doubt in the world, all the benefit of the doubt, and you think that he just provided a gun to Mr. Mosby to shoot up that house, what's the natural probable consequence of using an SKS assault rifle to shoot up a house? That somebody's gonna get hurt or killed.

So you've got to think about what Mr. Mosby intended. Whatever he intends transfers onto Mr. Anderson if he's helping him in anyway [sic]. But even if you wanna give him any kind of benefit of the doubt, there's this language that you have to consider also, the natural and probable consequences of Mr. Anderson's actions.

\*\*\*

When you think about the intent in this case, this wasn't like Mr. Anderson just brought a rifle from around the block. It wasn't an easy feat. He actually had to drive many miles after communicating with Mr. Mosby to go get that rifle. And again, he had a choice. He could have brought the .9 millimeter, but he brought the SKS assault rifle. Why? Because that's what Mosby wanted him to do and he was more than happy to help.

What does an assault rifle do? Cuts through walls. Mr. Mosby complained all day about wanting to kill that bitch and her son. You think he didn't tell Mr. Anderson that? Why else would Mr. Anderson go get the assault rifle? He provided it to Mosby, he provided clothing to Mr. Mosby, and he provided the ride. He's an aider and abettor and he intended to help Mr. Mosby do what he went there to do that night.

Defense counsel took exception and argued to the jury that Anderson had no knowledge of what Mosby intended to do with the rifle:

But what is most important here is whether Mr. Anderson had knowledge of any intent to commit a crime, to commit a killing or a shooting at all, and I submit to you at the outset that that evidence is going to fail because it's not there. Excuse me.

Now, you also will be dealing with the felony firearm and felon in possession charges. I am not gonna waste a whole lot of time. The Eastwood address is an address associated with Mr. Anderson. His wife apparently lives there. The police tell us he is coming out of that residence. There are bills there in his name. There is clothing there that they say is Mr. Anderson's. I think that you can deal with that as you should.

My issue, and we take great exception, is with the murder charge. Whether you believe that the murder was premeditated or second-degree murder, what is at the heart of the matter is whether Mr. Anderson knew what was going to happen. Whether Mr. Anderson assisted with the intent of the killing knowing the intent of the shooter.

That is what aiding and abetting requires, is that there be proof beyond a reasonable doubt that he intentionally assisted before or during the killing of Jakari Pearson. And that he intended the killing or that he knew that the shooter intended the killing himself.

\*\*\*

But on this day, you hold Mr. Anderson's fate in your hand. You're the finders of the facts. You're the judges of the facts. We ask that you do justice and justice demands in this case that certainly as to the murder charges, there is no proof beyond a reasonable doubt of his knowledge, of his intent that there be a killing or a shooting at that home, or that he had knowledge before the crime that that was going to be committed, or that he provided a weapon for that to be done, it just does not exist on this record. And so we ask you to do justice again.

In response, the prosecutor argued during rebuttal:

Mr. Anderson, oh he intended for Mr. Mosby to do what he did. He intended to give him that rifle to shoot up that house. This wasn't a scare tactic. He had a choice between guns. He also had several choices to make, and he made the wrong one every time. But again, it matters what Mr. Mosby intended. What did Mr. Mosby intend? And for s [sic] penny, in for a pound, Mr. Anderson helps him, he's just as guilty.

"Prosecutorial comments must be read as a whole and evaluated in light of defense arguments and the relationship they bear to the evidence admitted at trial." *People v Brown*, 279 Mich App 116, 135; 755 NW2d 664 (2008). It is clear that the prosecutor was responding to Anderson's argument that lack of knowledge absolved him of any wrong-doing. Pointing to the evidence in the record, the prosecutor mapped out Anderson's knowledge. She did not argue that lack of knowledge was irrelevant; rather, she argued that the evidence clearly supported a

finding that Anderson acted purposefully and with full knowledge of the natural and probable consequences of his conduct.

Additionally, the trial court properly instructed the jury on the law of aiding and abetting and further instructed the jury: "The lawyers' statements and arguments and any commentary are not evidence. They are only meant to help you understand the evidence in each side's legal theories. You should only accept things the lawyers say that are supported by the evidence or by your own common [] sense and general knowledge." Therefore, even if anything that the prosecutor said could be construed as a misstatement of law, the jury was correctly instructed.

## 2. IMPROPER APPEAL TO THE JURY'S EMOTIONS

Anderson next argues that the prosecutor improperly appealed to the jury's sympathy when she asked for justice for Jakari in the following instances:

> I'm gonna have one more chance to address the Mosby jury in this case, when I do, I'm gonna ask for justice – for justice for Jakari. NO child should be unsafe sleeping in their own bed. What Mr. Mosby did, it was deliberate, it was intentional. He killed that little boy. He did it on purpose. I'm gonna ask you to find him guilty when you return.

> ***

> Under the cover of darkness, kill a woman and her child. I'm gonna have another chance to address you all, so when I do, I'm gonna ask for justice for Jakari and I'm gonna ask that you return a verdict guilty on all counts.

> ***

> What happen[ed] to [J]akari, shouldn't happen. No child should be sleeping in their bed, minding their own business and murdered in their sleep. Ms. Cochran didn't deserve this. Jakari didn't deserve this.

> ***

> There are no do-overs with a trial. This is it Jakari, he gets justice from me, from you, or does he get it? I'm gonna ask you to go back and do the work, and that you return a verdict of guilty on all counts.

"The prosecutor may not inject issues into a trial that are broader than the defendant's guilt or innocence. The prosecutor commits misconduct when he or she invites jurors to suspend their powers of judgment and decide the case on the basis of sympathy or civic duty." *People v Lane*, 308 Mich App 38, 66; 862 NW2d 446 (2014). "A prosecutor may not appeal to the jury to sympathize with the victim. Nor may a prosecutor urge the jury to convict as part of its civic duty or on the basis of its prejudices." *Unger*, 278 Mich App at 237. The issue is whether the prosecutor's comments deflected the jury's attention from the evidence of the case. *Id.*

The prosecutor was not asking the jury to convict Anderson so that *someone* could be held accountable for his death and the family could have a measure of justice; instead, the prosecutor clearly argued that, in light of all the evidence presented at trial, Anderson was guilty and his conviction would be just.

## B. MOSBY

### 1. IMPROPER VOUCHING

Mosby argues that the prosecutor improperly vouched for Starks's testimony when the prosecutor told the jury "we want you to know that the work is done and it's done right, that's the nature of the evidence." "A prosecutor may not vouch for the credibility of his witnesses by suggesting that he has some special knowledge of the witnesses' truthfulness." *People v Seals*, 285 Mich App 1, 22; 776 NW2d 314 (2009).

Mosby takes the prosecutor's comments out of context. The prosecutor made the statement, not to vouch for Starks, but in response to Mosby's assertion that there was no fingerprint evidence. The prosecutor explained that, unlike on television, police were often asked to make a choice between testing for DNA evidence or fingerprints:

> We send the gun for prints, the testimony in this case, we have to choose because one test will wipe out the other test. The DNA is the more thorough test. It's not like CSI. You get mixed profiles, people have touched that gun, we had DNA on the gun, we just can't get the profile of it. We want you to know that the work is done and it's done right, that's the nature of the evidence. I wish we were like CSI, but it's not. But you've got Mr. Mosby and Mr. Anderson telling on themselves, you've got all the physical evidence in this case. You've got Mr. Mosby making these threats all day long, talking about what he was gonna do, leaving voice mails, calling his friend, Mr. Anderson, who has that SKS assault rifle.

The comments were a fair response to Mosby's attempt to point to the lack of physical evidence connecting him to the gun.

### 2. ARGUING FACTS NOT IN EVIDENCE

Mosby next argues that the prosecutor argued facts not in evidence when she told the jury that gunshot residue had been transferred from Mosby's hands to his tattoo bag.

"It is improper bolstering for a prosecutor to vouch for credibility of facts and evidence not in the case." *People v Stanaway*, 446 Mich 643, 686; 521 NW2d 557 (1994). The prosecutor argued:

> Mr. Starks is not the shooter, that's why the dog didn't hit on Mr. Starks shirt, but that bag, that giant bag. What's the first thing that Mr. Mosby went and picked up after shooting that gun and handling that gun? His bag. You pick up the bag, when you pick up something, yeah, it can transfer the residue. You can

put it on your back when you fire the gun. Yeah, that gunshot residue it's gonna transfer onto that bag, and sure enough the dog hits on that bag.

The prosecutor did not argue facts not in evidence. Starks testified that Mosby retrieved his tattoo bag after the shooting.

### 3. LEADING QUESTIONS

Mosby also argues that he was prejudiced by the prosecutor's "excessive use of leading questions during her direct examination of the witnesses" and then basically points to two instances in the record. Defense counsel never objected. Mosby fails to make a cogent argument as to how he was prejudiced by such leading questions.

### 4. CUMULATIVE ERROR

Finally, Mosby argues that the cumulative effect of the prosecutor's misconduct denied him of a fair and impartial trial. It is true that "[t]he cumulative effect of several minor errors may warrant reversal even where individual errors in the case would not," *People v McLaughlin*, 258 Mich App 635, 649; 672 NW2d 860 (2003), there were no errors, minor or otherwise.

## IV. STARKS'S COMPETENCY TO TESTIFY

Mosby argues that Starks was not competent to testify. "The determination of the competency of a witness is a matter within the discretion of the trial court. Such determination will be reversed only for an abuse of discretion." *People v Breck*, 230 Mich App 450, 457; 584 NW2d 602 (1998) (internal citation omitted).

A trial court may exclude the testimony of a witness if that witness if found incompetent under MRE 601, which provides:

> Unless the court finds after questioning a person that the person does not have sufficient physical or mental capacity or sense of obligation to testify truthfully and understandably, every person is competent to be a witness except as otherwise provided in these rules.

The trial court cannot be said to have abused its discretion when it was never asked to exercise its discretion. Additionally, Mosby's attempt to make this a competency issue must fail. There is no indication that Starks lacked the physical or mental capacity to testify. Mosby claims that Starks was not competent to testify based on alleged contradictory evidence and Starks's self-interest. Such issues go to Starks's credibility, not competency. As previously stated, an appellate court "will not interfere with the trier of fact's role of determining the weight of the evidence or the credibility of witnesses." *Eisen*, 296 Mich App at 331.

## V. COCHRAN'S IN-COURT CRYING

Mosby next argues that he was deprived of a fair trial when the trial court allowed Cochran to remain in the courtroom despite her continual, excessive crying. Whether a defendant received a fair trial is a constitutional question of law that is reviewed de novo on

appeal. *People v LeBlanc*, 465 Mich 575, 580; 640 NW2d 246 (2002). "Normally, discretionary issues are reviewed for an abuse of discretion, which is an unusually difficult standard to overcome." *Lease Acceptance Corp v Adams*, 272 Mich App 209, 222; 724 NW2d 724 (2006).

Immediately after the 911 call was played for the jury the following exchange took place outside of the presence of the jury:

> MS. REED [Mosby's attorney]: I understand the victim's rights to be able to, the right to stay in the courtroom, but at certain points when certain evidence is being presented, if Miss Cochran is going to be unable to control her emotions, my client is not gonna receive a fair trial. I'm gonna ask that she not be allowed to stay in the courtroom, just crying, and crying, and crying. I believe that is very prejudicial to my client, and I do not believe he can get a fair trial with her sitting there crying.

***

> THE COURT: Okay.
>
> Well, the Crime Victims Rights Act says that she has the right to remain in the courtroom.
>
> And you know, I, I have no authority to order her not to cry.
>
> I mean, her son's dead.
>
> And just by the fact that she's emotional over the loss of her son, doesn't in any way, I don't believe, prejudice your client, because it doesn't do anything to establish that he did or didn't do it.
>
> And I have instructed the jury during jury selection, and I will remind them again, that sympathy cannot play any role in their decision, in this case.
>
> And so, your objection is noted and preserved for the record.
>
> But I'm not going to tell a woman who lost her child that she can't cry.
>
> I mean, it just – it is what it is. It's an emotional thing, and she – by statute, she has a right to – by law, she has the right to be in the courtroom, and I'm not going to tell her that she has to leave.

During testimony that involved photographs of the crime scene, the following exchange took place:

> MS. REED: Because the Court has already ruled on my objection to Mrs. Cochran being in the courtroom, and being emotional.
>
> The Court has ruled on that. I understand the ruling.

THE COURT: You're just making a record.

MS. REED: By me making a record, and during Officer Diaz's testimony, where they were showing pictures of the interior of the house, and the – her son's bedroom, she was audibly and visibly crying in the back of the courtroom. That's just for the record . . .

MCL 780.761 provides: "The victim has the right to be present throughout the entire trial of the defendant, unless the victim is going to be called as a witness." Mosby cites no law to support his position that alleged excessive crying served as a basis for excluding Cochran from the courtroom. "Issues insufficiently briefed are deemed abandoned on appeal." *People v Van Tubbergen*, 249 Mich App 354, 365; 642 NW2d 368 (2002).

## VI. INEFFECTIVE ASSISTANCE OF COUNSEL

Anderson argues that he received ineffective assistance of counsel at trial. Because there was no *Ginther*[1] hearing, our review is limited to mistakes apparent on the record. *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012).[2]

"To establish a claim of ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that counsel's deficient performance prejudiced the defense. In order to demonstrate that counsel's performance was deficient, the defendant must show that it fell below an objective standard of reasonableness under prevailing professional norms. In so doing, the defendant must overcome a strong presumption that counsel's performance constituted sound trial strategy." *People v Riley*, 468 Mich 135, 140; 659 NW2d 611 (2003), citing *Strickland v Washington*, 466 US 668, 687; 104 S Ct 2052; 80 L Ed2d 674 (1984); *People v Pickens*, 446 Mich 298, 302-303, 521 NW2d 797 (1994).

## A. FAILURE TO MOVE TO STRIKE MACKIE'S TESTIMONY

Sergeant Samuel Mackie interviewed Anderson for six hours. Although the interview was videotaped, the video was not played for the jury because of the references to Anderson's parolee status at the time of the crime. At trial, Mackie testified that defendant denied knowing anyone associated with the case. On cross-examination, Mackie admitted that he could not recall everything and said that he was under the impression that the videotape would be played for the jury. The trial court asked, but did not order, Mackie to review the tape and resume his testimony the following day.

Contrary to Anderson's contention on appeal, Mackie did, in fact, view the video. When trial began the following day, defense counsel asked:

---

[1] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[2] We denied Anderson's motion to remand. *People v Anderson,* unpublished order of the Court of Appeals, entered February 17, 2016 (Docket No. 327732).

*Q*. Sergeant Mackie, on yesterday the judge asked you to review the videotape of the interview. Did you do that?

*A*. I did.

Defense counsel only asked a few questions. The trial court later noted its dismay: "We sent the jury home, we brought this witness back today only to have you ask him three questions, which I mean it was really much to do [sic] about nothing." There was, therefore, no basis for counsel to ask that Mackie's testimony be stricken. "Counsel is not required to raise meritless or futile objections." *People v Eisen*, 296 Mich App 326, 329; 820 NW2d 229 (2012).

## B. FAILURE TO OBJECT TO EVIDENCE REGARDING THREATS TO STARKS'S FAMILY

Anderson next argues that defense counsel was ineffective for failing to object to testimony regarding threats to Starks's family. Starks's mother and brother both received threats and his mother was ultimately relocated. Starks believed these threats came from "Titi," who was Anderson's passenger on the night of the shooting. Evidence of threats against a witness must be linked to the defendant if the evidence is offered to show the defendant's consciousness of guilt. *People v Sholl*, 453 Mich 730, 740; 556 NW2d 851 (1996). A jury could infer that Titi was a passenger in Anderson's car when the shooting occurred and was acting on Anderson's behalf when the alleged threats were made. Evidence that a witness was threatened by someone other than the defendant is also admissible for its relevance to the witness's credibility to explain a reluctance to testify, or to explain prior inconsistent statements of the witness. *People v Johnson*, 174 Mich App 108, 112; 435 NW2d 465 (1989); *People v Clark*, 124 Mich App 410, 412–413; 335 NW2d 53 (1983). Even if Anderson's attorney should have objected, Anderson fails to show prejudice in light of the overwhelming evidence against Anderson.

## C. FAILURE TO OBJECT TO THE PROSECUTOR'S CLOSING ARGUMENTS

Finally, defendant argues that defense counsel was ineffective for failing to object to the prosecutor's misstatement of law during closing arguments as well as the prosecutor's improper appeal for justice for Jakari. However, as previously explained in Section III(A)(2) above, these comments were not improper and counsel was under no obligation to object. *Eisen*, 296 Mich App at 329.

Affirmed.

/s/ Michael J. Talbot
/s/ Kirsten Frank Kelly
/s/ Christopher M. Murray